UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| Judy Lalonde, individually and as a representative of a class of similarly situated persons, and on behalf of the MassMutual Thrift Plan, | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiff,<br>vs. | )<br>)<br>) |
| | ) |
| Massachusetts Mutual Life Insurance Co., Roger Crandall, Investment Fiduciary Committee, Plan Administrative Committee, and John and Jane Does 1–20, | )<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

Case No.

CLASS ACTION COMPLAINT

## I.    **NATURE OF ACTION**

1.      This is a civil enforcement action brought pursuant to Sections 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. § 1132(a)(2) and (a)(3), for violations of ERISA's fiduciary duties and prohibited transactions provisions. Plaintiff Judy Lalonde ("Plaintiff"), who is a participant in the MassMutual Thrift Plan (the "Plan" or "MassMutual Plan"), brings this action on behalf of the Plan and all participants and beneficiaries in the Plan during the Class Period.

2.      Defendants are fiduciaries of the MassMutual Plan, who are required by ERISA to act prudently and solely in the interest of the Plan's participants and beneficiaries. *See* 29 U.S.C. § 1104(a)(1). These fiduciary duties are the "highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263,

272 n.8 (2d Cir. 1982)); *see also Glass Dimensions, Inc. v. State St. Bank & Tr. Co.*, 931 F. Supp. 2d 296, 304 (D.Mass. 2013) (same).

3.      As described herein, Defendants violated ERISA's fiduciary duties under 29 U.S.C. § 1104 and its prohibitions on self-dealing under 29 U.S.C. § 1106 by managing the Plan and its assets through a process that favored the economic interests of Massachusetts Mutual Life Insurance Company ("MassMutual" or the "Company") over those of Plan participants and beneficiaries. This flawed process resulted in a series of outcomes that caused the Plan and its participants and beneficiaries to sacrifice retirement savings to poor performance and swollen costs which inured to the benefit of MassMutual's bottom line.

4.      Among other things, Defendants (1) retained a series of excessively expensive and poorly performing proprietary mutual funds that are rarely, if ever, selected by objective and non-conflicted fiduciaries of large retirement plans like the MassMutual Plan; (2) failed ensure that the Plan held the least expensive share class and/or investment vehicle for the investment strategies Defendants selected for the MassMutual Plan; (3) caused the MassMutual Plan to transfer a substantial portion of its assets into MassMutual's general account in connection with the Plan's stable value investment, granting the Company a bounty to use for its business, without adequately compensating the Plan for the risk this imposed on the Plan or considering alternative stable value products with better terms; and (4) caused the MassMutual Plan use pay MassMutual unreasonable recordkeeping fees while attempting to off-load that business line to Empower.

5.      This conduct ultimately resulted in the Plan and its participants and beneficiaries sacrificing tens of millions of dollars in retirement savings through poor performance and above-average expenses (for which MassMutual was usually the benefactor). Notably, in the past few

years, the Company brought in well over $50 million in compensation directly from the Plan's investment in its proprietary products, all while using the Plan as an anchor client to support its marketability and corporate initiatives, like the sale of the Company's retirement business to Empower for $2.35 billion.

6.      Plaintiff brings this action to remedy this unlawful conduct and obtain other appropriate relief as provided by ERISA.

## II.      JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

8.      Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, the alleged fiduciary breaches and other ERISA violations took place in this District, and Defendants reside here and may be found in this District.

9.      This Court has personal jurisdiction over Defendants because they reside in this District, transact business in this District, and have significant contacts with this District. ERISA provides for nationwide service of process.

## III.      PARTIES

### A.      Plaintiff

10.      Plaintiff Judy Lalonde resides in Chicopee, Massachusetts in Hampden County. Plaintiff was an employee of MassMutual for seventeen years from 2004 until 2021, and remains a participant in the MassMutual Plan.

11.    Plaintiff's individual account in the Plan has been invested in both MassMutual-affiliated investments and non-MassMutual-affiliated investments during the Class Period. In addition, Plaintiff paid recordkeeping fees in connection with her Plan account.

12.    Plaintiff has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. In turn, MassMutual has been unjustly enriched from the various fees and expenses generated as a result of Plaintiff's Plan investments, and also through the fees charged to Plaintiff for recordkeeping services.

13.    Plaintiff, like substantially all Plan participants, was not provided any information regarding the substance of deliberations, if any, of the Plan's Investment Fiduciary Committee or Plan Administrative Committee during the Class Period, and otherwise had no knowledge of the substance of the Committees' deliberations. Plaintiff discovered her claims shortly before commencing this action.

14.    Prior to filing this action, Plaintiff Lalonde sought documents concerning the Plan and its investments from the Plan's administrator pursuant to 29 U.S.C. § 1024(b)(4) and 29 C.F.R. § 2550.404a-5, but never received a response.

**B.    Defendants**

15.    Defendant **Massachusetts Mutual Life Insurance Co.** ("MassMutual") is a mutual life insurance company with its principal place of business at 1295 State Street, Springfield, MA 01111, in Hampden County. MassMutual, directly and/or through its affiliates, offers a wide range of insurance, accumulation, wealth management, and retirement products and services.

16.    MassMutual is the Plan Sponsor within the meaning of 29 U.S.C. § 1002(16)(B), and it has ultimate decision-making authority with respect to the Plan and the management and

4

administration of the Plan and the Plan's investments. Because MassMutual exercises discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, it is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

17.    MassMutual is also a fiduciary because it has authority to appoint and remove members of the Plan's Investment Fiduciary Committee and Administrative Committee (the "Committees") through its Chairman and CEO. On information and belief, all members of the Investment Fiduciary Committee and Administrative Committee are MassMutual employees who were appointed to the Committees by MassMutual, and were subject to removal by MassMutual. It is well accepted that the authority to appoint, retain, and remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Norton Co. v. John Hancock Mut. Life Ins. Co.*, 1992 WL 237410, at *6 (D. Mass. Sept. 14, 1992) ("An employer has a fiduciary duty when it appoints other fiduciaries, such as a pension committee."); *Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132, 142 (D. Mass. 2004) (appointment authority confers fiduciary status); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) ("It is by now well-established that the power to appoint plan trustees confers fiduciary status."). The responsibility for appointing and removing members of the Investment Fiduciary Committee carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they were complying with the terms of the Plan and ERISA's statutory standards. 29 C.F.R. § 2509.75-8 (FR-17). Furthermore, this monitoring duty carries with it a responsibility "to take action upon discovery that the appointed fiduciaries [were] not performing properly." *Liss v. Smith*, 991 F. Supp. 278, 311 (S.D.N.Y. 1998).

18.     MassMutual is also a party-in-interest to the Plan within the meaning of 29 U.S.C. § 1002(14) because, *inter alia*, it is a fiduciary to the Plan, an employer of participants in the Plan, and provides services to the Plan.

19.     Defendant **Roger Crandall** has been the Company's Chief Executive Officer since 2010. He is also the Chairman of the Company's Board of Directors and serves as the Executive Chair of the Board's Investment and Technology & Governance Committees.

20.     Crandall exercised MassMutual's authority to make appointments to the Investment Fiduciary and Plan Administrative Committee. To the best of Plaintiff's knowledge based on available information, Crandall appointed the members of the Investment Fiduciary Committee and Administrative Committee who served during the Class Period. Crandall's exercise of authority to appoint fiduciaries of the Plan also confers functional fiduciary status on Defendant Crandall.

21.     In addition, Crandall was himself a member of the Company's Investment Fiduciary Committee during the Class Period. In this capacity, Crandall was responsible for selecting and monitoring the Plan's investment options, controlling investment-related fees, and other matters relating to the Plan. Because Crandall has exercised discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, he is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

22.     Defendant Crandall is also a party-in-interest to the Plan within the meaning of 29 U.S.C. § 1002(14) because, *inter alia*, he is an officer, director, and employee of the Company.

23.     The **Investment Fiduciary Committee** has been delegated responsibility for the Plan's' investment lineup, including selecting and monitoring the Plan's investment options,

6

making changes as appropriate, and controlling investment-related fees. The Investment Fiduciary Committee is a functional fiduciary pursuant to 29 U.S.C. § 1002(21)(A) given this discretionary authority. In addition, the Investment Committee is a named fiduciary of the Plan within the meaning of 29 U.S.C. § 1102(a)(1).

24.     The **Administrative Committee** is responsible for, among other things, administering the Plan, selecting and monitoring the Plan's recordkeeper, and determining recordkeeper compensation and controlling recordkeeping fees. The Administrative Committee is a functional fiduciary pursuant to 29 U.S.C. § 1002(21)(A) given its discretionary authority in the administration of the Plan. In addition, the Administrative Committee is also a named fiduciary of the Plan pursuant to 29 U.S.C. § 1102(a).

25.     At the time the Complaint was filed, Plaintiff did not know the identity of the Plan's fiduciaries who served on the Investment Fiduciary Committee and Plan Administrative Committee (other than Defendant Crandall). These individuals are collectively referred to herein as **John and Jane Does 1–20**. The Investment Fiduciary Committee, Plan Administrative Committee, John and Jane Does 1-20, and Crandall are collectively referred to herein as the "Committee Defendants."

## IV.     FACTS

### A.     The Plan

26.     The Plan is a tax-qualified defined contribution pension plan subject to the provisions of ERISA. At all relevant times, the Plan was an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A).

27.    The Plan is intended to encourage savings and provide retirement income for MassMutual employees and former employees and their beneficiaries.

28.    The Plan covers eligible employees of MassMutual, including all subsidiaries of MassMutual.

29.    The Plan's benefits are funded by participants' voluntary tax-deferred contributions and by employer matching contributions. The Plan is intended to qualify under Internal Revenue Code § 401(k).

30.    Participants in the Plan can direct the investment of the assets allocated to their respective individual accounts in the Plan, and the return on those investments, less any fees, is credited to each participant's account. Participants can only invest in the investment options selected and retained for the Plan by Defendants. Participants pay fees and expenses (both direct and indirect) based on the fund options selected and maintained by the fiduciaries of the Plan.

31.    As of December 31, 2021, the Plan had approximately $4.1 billion in assets and 23,662 participants. The Plan is one of the largest defined contribution plans in the country and is considered a "mega plan" in the retirement community.  Due to its size, the Plan and its fiduciaries have enormous bargaining power to obtain superior investment products and recordkeeping services at extraordinarily low cost.

### B.    Prior Lawsuit and Ongoing Government Investigation

32.    In 2013, participants in the Plan filed a class action lawsuit against various MassMutual-affiliated defendants. *See Gordan v. MassMutual Life Insurance Co., et al.*, No. 3:13-cv-30184, ECF No. 1 (D. Mass. 2013). The plaintiffs in that suit alleged that the defendants placed MassMutual's interests above plan participants' interests in violation of ERISA's duty of loyalty.

For example, the plaintiffs alleged that the decision to offer MassMutual mutual funds in the Plan was motivated by self-interest and that MassMutual offered high-fee mutual funds despite the availability of comparable cheaper alternatives. The plaintiffs also alleged that the defendants committed prohibited transactions under ERISA by including proprietary funds in the Plan and compensating MassMutual for various services it provided to the Plan.

33.    In June 2016, the parties moved for preliminary approval of a class action settlement agreement. This motion was filed after the defendants' motion to dismiss was filed, but before any order by the court on the motion to dismiss. In November 2016, the court issued a judgment approving the settlement agreement.

34.    Pursuant to the settlement agreement, the defendants paid $30.9 million to a settlement fund. See *Gordan*, No. 3:13-cv-30184, ECF No. 137 at ¶ 2.26. Additionally, within six months of the Settlement Effective Date, the defendants were required to (among other things) ensure that Plan participants were charged no more than $35 per participant for standard recordkeeping services. *id.* at ¶ 10.9.

35.    The "Settlement Effective Date" of the settlement agreement was the day on which the final approval order became final. Id. at ¶ 2.41. The court entered final approval on November 3, 2016. *See Gordan*, No. 3:13-cv-30184, ECF No. 140, and that order became final under the Settlement Agreement 30 days later on December 3, 2016, *id.*, ECF No. 137 at ¶ 2.23.

36.    The claims in this case are limited to the period *after* the Settlement Effective Date in the prior suit.  The release of claims in the Settlement Agreement therefore does not apply. *See Moitoso v. FMR LLC*, 451 F. Supp.3d 189, 201-03 (D. Mass. 2020).

37.     The U.S. Department of Labor ("DOL") separately initiated an investigation of the Plan that in 2013. Based on the Plan's latest filing with DOL, that investigation remains in progress.

### C.     ERISA's Fiduciary Duties and Prohibited Transactions Provisions

38.     ERISA strictly regulates the manner in which retirement plan fiduciaries must manage and administer retirement plans.

39.     ERISA's duty of loyalty requires fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries … for the exclusive purpose of (i) providing benefits to participants and beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). This requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . ." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

40.     ERISA's duty of prudence requires fiduciaries to carry out their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . ."  29 U.S.C. § 1104(a)(1)(B).   This prudence standard applies to "fiduciaries' investment decisions and disposition of assets," *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted), and includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S.

Ct. 1823, 1828 (2015). Thus, fiduciaries may be held liable for either "assembling an imprudent menu of investment options" or for failing to monitor the plan's investment options to ensure that each option remains prudent. *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)). Moreover, prudence also requires careful attention to both investment and administrative fees. *See* Restatement (Third) of Trusts § 90 cmt. b ("[C]ost- conscious management is fundamental to prudence in the investment function . . . ."); *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (affirming judgment against plan sponsor based on "overpaying" recordkeeper); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (failure to solicit bids, and higher-than market recordkeeping fees, supported triable fiduciary breach claim).

41.     ERISA supplements these fiduciary duties by "categorically barring certain transactions deemed likely to injure the pension plan." *Harris Tr. and Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000). Among other things, these restrictions prohibit Plan fiduciaries from causing the Plan to engage in transactions with themselves or other fiduciaries or parties-in-interest. *See* 29 U.S.C. § 1106(a)-(b).  Section 1106(a)(1) states, in pertinent part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> . . .
>
> (C)    furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

Section 1106(b) further provides, in pertinent part:

A fiduciary with respect to the plan shall not –

> (1)    deal with the assets of the plan in his own interest or for his own account,
>
> (2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or
>
> (3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

### D.    Defendants' Unlawful Conduct

42.    Defendants' conduct was inconsistent with ERISA's fiduciary duties and prohibited transaction provisions in numerous respects, as detailed below.

> 1.    <u>Use of MassMutual's Group Annuity Contract for Self-Interested Business Reasons.</u>

43.    All Plan assets are invested through MassMutual's Group Annuity Contract SF 1550-1 (the "GAC").

44.    It is uncommon for mega-sized retirement plans—those holding assets of $1 billion or more—to offer investment options through a MassMutual Group Annuity Contract.

45.    According to a 2019 research paper by PLANSPONSOR, MassMutual does not serve the mega plan market.[1]

46.    In June 2020, MassMutual reported that the average plan serviced by its retirement plan business held $6.4 million in assets and had 96 participants. Given the Plan's massive asset base, exceeding $3.8 billion at that time, it is ***590 times*** larger than MassMutual's average client.

---

[1] Research | 2019 PLANSPONSOR Best in Class DC Providers, *available at* https://www.plansponsordigital.com/plansponsor/december-january_2020/index.php?startid=27#/p/31

47. The reason that mega plans (other than the MassMutual Plan) do not invest their assets through a group annuity contract with MassMutual is simple: such plans are able to procure better terms on their own than through a MassMutual group annuity contract, which is designed to serve the needs of smaller plans with less bargaining power.

48. Defendants invested Plan assets through the MassMutual GAC in order to benefit MassMutual, not the Plan's participants and beneficiaries. Through the MassMutual GAC, MassMutual offers a series of proprietary investment products that generate revenue and fees for MassMutual. Moreover, investing Plan assets through the MassMutual GAC significantly increased MassMutual's assets under management ("AUM"), which was beneficial to MassMutual for marketing and other business reasons.

49. During the Class Period, MassMutual's retirement plan business was up for sale. On January 4, 2021, MassMutual announced that Empower Retirement had closed its acquisition MassMutual's retirement plan business, which included the Plan's assets, for $2.35 billion.[2]

50. Had Defendants divested from the MassMutual GAC and moved the Plan into an unaffiliated structure more typical for mega plans, MassMutual's efforts to sell its retirement plan business would have been impaired because the Plan's exit would have caused a significant outflow of assets.

---

[2] Empower Retirement Closes Acquisition of MassMutual Retirement Plan Business, *available at* https://www.massmutual.com/about-us/news-and-press-releases/press-releases/2021/01/empower-retirement-closes-acquisition-of-massmutual-retirement-plan-business

2.     Retention of Inferior Mutual Funds Affiliated with MassMutual

51.     Within the GAC, Defendants retained numerous mutual funds for the Plan's investment lineup during the Class Period that were managed by a MassMutual affiliate, MML Investment Advisers, LLC (referred to herein as the "MM Funds").

52.     As of December 31, 2016, the MM Funds represented two-thirds of the total investment options in the Plan (14 of 21), and together with the Plan's proprietary stable value fund (discussed *infra* at § IV.D.3), the total number of proprietary options was over 70% (15 of 21).[3]

53.     Defendants subsequently removed four proprietary index funds from the Plan in 2017, but kept all of the proprietary funds that were actively-managed and, not coincidentally, generated higher fees. As of year-end 2021, the MM Funds still represented half of the total investment options in the Plan (10 of 20), and 55% of the total investment options (11 of 21) when combined with the Plan's proprietary stable value fund.

54.     Defendants retained MM Funds because doing so was in MassMutual's self-interest, *not* because doing so was in the best interest of the Plan's participants and beneficiaries. As discussed below, the MM Funds were excessively costly and they underperformed relative to market benchmarks and materially-identical funds from unaffiliated companies.

---

[3] These figures treat the Plan's target date suite as a single investment option, consistent with industry practice. *See, e.g.*, INVESTMENT COMPANY INSTITUTE, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018, at 34 (Jul. 2021), *available at* https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf (displaying the "[t]arget date fund-adjusted average" number of investment options); *accord*, *Waldner v. Natixis Inv. Mgrs, L.P.*, 2021 WL 9038411, at *1 n.2 (D. Mass. Dec. 20, 2021).

a.     *Excessive and Unnecessary Costs*

55.     Each of the MM Funds is a sub-advised mutual fund sponsored by MassMutual. Because each of the MM Funds is sub-advised, third-party investment firms dictate how the MM Funds' assets will be invested and receive a portion of the investment management fee in return. MassMutual, though its affiliates, receives the balance of the fee.

56.     As an alternative to using the MM Funds, the Plan could have accessed the same investment strategies implemented by the MM Funds' sub-advisors directly from the sub-advisors. This would have substantially reduced the expenses borne by the Plan, but Defendants failed to consider this approach because it would have eliminated the compensation earned by MassMutual.

57.     For example, the MassMutual Blue Chip Growth Fund is sub-advised by T. Rowe Price Associates, Inc. and Loomis, Sayles & Company, L.P. This Fund's portfolio managers are Paul D. Greene II and Aziz V. Hamzaogullari, who are employees of the respective sub-advisors.

58.     MassMutual, through its affiliates, charges the Plan at least 0.66% of every dollar it invests in the MassMutual Blue Chip Growth Fund.

59.     T. Rowe Price sponsors a series of Blue Chip Growth Funds that it manages. Paul Greene, II is the manager of this fund series and implements a materially identical investment strategy for the T. Rowe Price Blue Chip Growth Funds as he uses in the MassMutual Blue Chip Growth Fund.

60.     The T. Rowe Price-sponsored Blue Chip Growth strategy has found much greater market acceptance than the MassMutual Blue Chip Growth Fund. The MassMutual Select Blue Chip Growth Fund has approximately 5% as many assets under management as the T. Rowe Price sponsored strategy does.

61.     Given the Plan's substantial assets, it had access to T. Rowe Price's Blue Chip Growth strategy for an expense ratio of only 0.40%. Had Defendants considered and adopted this unaffiliated management structure, which executed the same strategy and was managed by the same T. Rowe Price professional as the MassMutual Blue Chip Growth Fund, the Plan could have saved approximately $750,000 a year.

62.     Relatedly, Loomis Sayles sponsors a series of Growth Funds that it manages. Aziz Hamzaogullari is the manager of this fund series and implements a materially identical investment strategy for the Loomis Sayles Growth Funds as he uses in the MassMutual Blue Chip Growth Fund.

63.     The Loomis Sayles-sponsored Growth strategy has found much greater market acceptance than the MassMutual Blue Chip Growth Fund. The MassMutual Select Blue Chip Growth Fund has approximately 15% as many assets under management as the Looms Sayles sponsored strategy does.

64.     Given the Plan's substantial assets, it had access to Loomis Sayles' Growth strategy for an expense ratio of 0.43% or less. Had Defendants considered and adopted this unaffiliated management structure, which executed the same strategy and was managed by the same Loomis Sayles professional as the MassMutual Blue Chip Growth Fund, the Plan could have saved approximately $660,000 a year.

65.     Another example is the MassMutual Premier Strategic Emerging Markets Fund. This Fund is sub-advised by Invesco Advisers, Inc. This Fund's portfolio manager is Justin Leverenz, who is an employee of the respective sub-advisor.

66.     MassMutual, through its affiliates, charges the Plan at least 1.15% of every dollar it invests in the MassMutual Premier Strategic Emerging Markets Fund.

67.     Invesco sponsors a series of Strategic Emerging Markets Funds that it manages. Justin Leverenz is the manager of this fund series and implements a materially identical investment strategy for the Invesco Emerging Markets Equity Funds as he uses in the MassMutual Premier Strategic Emerging Markets Fund.

68.     Given the Plan's substantial assets, it had access to Invesco Emerging Markets Equity strategy for an expense ratio not exceeding 0.80%. Had Defendants considered and adopted this unaffiliated management structure, which executed the same strategy and was managed by the same Invesco professional as the MassMutual Premier Strategic Emerging Markets Fund, the Plan could have saved over $150,000 a year.

69.     Consistent with this alternative course of action, MassMutual created a series of collective investment trusts ("CITs") in March 2019 for other investors, including the MassMutual Fundamental Value CIT, MassMutual Small Cap Growth Equity CIT, and MassMutual Blue Chip Growth CIT.

70.     CITs are pooled investment vehicles, like mutual funds, that permit groups of investors to enjoy economies of scale by investing their money together. CITs are designed for tax-qualified investors like ERISA-governed retirement plans.

71.     The three MassMutual CITs listed in ¶ 69 were materially identical to MM Funds included in the Plan, but less expensive. The MassMutual CITs executed the same investment strategies as the MM Funds, and as detailed in the following chart, were managed by the same sub-advisors as the MM Funds.

| MM Fund | MM Fund Sub-advisor(s) | MassMutual CIT Analogue | CIT Sub-advisor(s) |
|---|---|---|---|
| Select Fundamental Value Fund | Boston Partners Global Investors | Select Fundamental Value CIT | Boston Partners Global Investors |
| | Barrow, Hanley, Mewhinney & Strauss | | Barrow, Hanley, Mewhinney & Strauss |
| Select Small Cap Growth Equity Fund | Wellington Management Company LLP | Select Small Cap Growth Equity CIT | Wellington Management Company LLP |
| Select Blue Chip Growth Fund | T. Rowe Price | Select Blue Chip Growth CIT | T. Rowe Price |
| | Loomis Sayles | | Loomis Sayles |

72.    Defendants failed to adequately consider these CITs and retained the MM Funds despite the availability of a less expensive but otherwise materiality identical alternatives. As a result, the Plan paid over $3 million in excessive compensation to MassMutual and/or its affiliates in connection with the MassMutual Select Blue Chip Growth Fund, MassMutual Select Fundamental Value Fund, and MassMutual Select Small Cap Growth Equity Fund alone, as reflected in the following chart:

| MM CIT Alternative | CIT Expense Ratio | Analogue MM Fund Expense Ratio | Rate of Annual Over-payment | Over-payment |
|---|---|---|---|---|
| MassMutual Fundamental Value CIT | 0.46% | 0.65% | 0.19% | $2,060,000 |
| MassMutual Small Cap Growth Equity CIT | 0.70% | 0.86% | 0.16% | $960,000 |
| MassMutual Blue Chip Growth CIT | 0.51% | 0.63% | 0.12% | $575,000 |

73.    The Plan had sufficient assets to access these CITs. For example, the Arthur J. Gallagher Co. Employees' 401(k) Savings and Thrift Plan invests in these CITs. It had only half as many assets invested in these CITs as the Plan had invested in the MM Fund analogues. Despite

the Plan having substantially more economic scale, it was paying more than this unaffiliated retirement plan for the respective investment strategies.

74.    The foregoing examples are illustrative of the excess costs associated with the MM Funds as a whole. Had Defendants conducted a prudent and objective review of the Plan's investment options, untainted by self-interest, they would have found numerous alternatives to the MM Funds that offered materially-identical investment strategies at lower cost.

75.    According to a 2018 survey by Brightscope and the Investment Company Institute, the MM Funds that remain in the Plan have consistently exceeded the average fee that other similarly sized retirement plans pay for funds in the MM Funds' respective fund categories.

| MM Fund Name | Expense Ratio | ICI Average |
|---|---|---|
| MassMutual Select Fundamental Value Fund (SIA-KY) | 0.65% | 0.57% |
| MassMutual Premier Strategic Emerging Markets Fund (SIA-QY) | 1.22% | 0.60% |
| MassMutual Select Small Cap Growth Equity Fund (SIA-IA) | 0.86% | 0.65% |
| MassMutual Select Small Company Value Fund (SIA-UY) | 0.96% | 0.57% |
| MassMutual Select Equity Opportunities Fund (SIA-TA) | 0.73% | 0.27% |
| MassMutual Premier Inflation-Protected and Income Fund (SIA-SM) | 0.47% | 0.29% |
| MassMutual Select Blue Chip Growth Fund (SIA-CKD) | 0.63% | 0.65% |
| MassMutual Premier Core Bond Fund (SIA-ED) | 0.42% | 0.28% |
| MassMutual Premier High Yield Fund (SIA-EV) | 0.54% | 0.63% |
| MassMutual Select Mid Cap Growth Fund (SIA-UH) | 0.70% | 0.57% |

76.    This difference in fees cannot be attributed to the fact that the MM Funds remaining in the Plan are actively-managed. Consistent with the results of the 2018 Brightscope and Investment Company Institute study, a 2021 Callan Institute Fee Study *of actively managed strategies* revealed that the average fees paid by investors with similar negotiating power to the Plan was far less than the Plan for similar investment strategies.

| MM Fund Name | Expense Ratio | Callan Study Average |
|---|---|---|
| MassMutual Select Fundamental Value Fund (SIA-KY) | 0.65% | 0.47% |
| MassMutual Premier Strategic Emerging Markets Fund (SIA-QY) | 1.22% | 0.69% |
| MassMutual Select Small Cap Growth Equity Fund (SIA-IA) | 0.86% | 0.78% |
| MassMutual Select Small Company Value Fund (SIA-UY) | 0.96% | 0.90% |
| MassMutual Select Equity Opportunities Fund (SIA-TA) | 0.73% | 0.44% |
| MassMutual Premier Inflation-Protected and Income Fund (SIA-SM) | 0.47% | 0.20% |
| MassMutual Select Blue Chip Growth Fund (SIA-CKD) | 0.63% | 0.46% |
| MassMutual Premier Core Bond Fund (SIA-ED) | 0.42% | 0.24% |
| MassMutual Premier High Yield Fund (SIA-EV) | 0.54% | 0.46% |
| MassMutual Select Mid Cap Growth Fund (SIA-UH) | 0.70% | 0.65% |

77.    Moreover, during the time period that the MassMutual index funds remained in the Plan, their fees were even more excessive relative to other index funds.[4]

78.    The MassMutual index funds had fees that were in some cases six times more expensive than widely-available alternatives that tracked the same index. The following chart illustrates the expense ratios charged by the MassMutual index funds and expenses charged by alternative index fund providers.  There are a substantial number of other index fund providers and vehicles that would have provided comparable, but less expensive, indexing than the MassMutual index funds during the class period.

| MM Index Fund | Expense Ratio | Alternative Index Fund | Expense Ratio | Annual Over-payment |
|---|---|---|---|---|
| MassMutual S&P 500 Index Fund | 0.12% | Vanguard Institutional Index Fund | 0.02% | ($271,766.00) |
| MassMutual Russell 2000  Index | 0.20% | Fidelity Small Cap Index Fund | 0.04% | ($151,704.00) |
| MassMutual MSCI EAFE International Index Fund | 0.25% | iShares MSCI EAFE International Index Fund | 0.09% | ($95,758.40) |
| MassMutual S&P Mid-Cap Index Fund | 0.20% | Vanguard S&P Mid-Cap 400 Index Fund | 0.08% | ($56,760.00) |

[4] Because index funds merely track a pre-set index, fees charged by the fund manager are the primary driver of performance relative to the reference benchmark.

b.    *Poor Performance*

79.    The additional costs associated with the MM Funds did not result in any additional services or benefits to plan participants. Rather, Plan participants have endured underperforming investments in addition to the unreasonably high expenses.

80.    As exemplars, the following table compares the average annual performance of the MassMutual Select Blue Chip Growth Fund, MassMutual Select Equity Opportunities Fund, MassMutual Premier Strategic Emerging Markets Fund, and MassMutual Selected Fundamental Value Fund relative to their 29 C.F.R. § 2550.404a-5(d)(1)(3) benchmarks over a 3, 5, and 10 year period as of December 31, 2021.

| MM Fund Name | Benchmark | Trailing Annual Average Underperformance | | |
|---|---|---|---|---|
| | | 3-year | 5-year | 10-year |
| MassMutual Select Blue Chip Growth Fund (SIA-CKD) | *Russell 1000 Growth Index* | -6.86% | -2.50% | -0.55% |
| MassMutual Select Equity Opportunities Fund (SIA-TA) | *Russell 1000 Index* | -5.77% | -2.47% | -0.92% |
| MassMutual Premier Strategic Emerging Markets Fund (SIA-QY) | *MSCI Emerging Markets Index* | -0.61% | -0.08% | -1.05% |
| MassMutual Select Fundamental Value Fund (SIA-KY) | *Russell 1000 Value Index* | -0.24% | -0.45% | -0.84% |

81.    During the Class Period, this underperformance caused the Plan to suffer more than $75 million of underperformance relative to their benchmarks. Yet, Defendants retained these investments despite their high fees and underperformance.

82.    The underperformance the Plan sustained through the MM Funds is not isolated to the Class Period. Prior to 2016, the MM Funds experienced tepid relative performance that caused non-conflicted plan fiduciaries to divest from the funds. For example, the Select Blue Chip Growth, Select Equity Opportunities, Premier Strategic Emerging Markets, and Select

Fundamental Value Funds underperformed their benchmarks on an annualized basis by - 1.2%, - 2%, - 2%, and - 1.5%, respectively, during the three years preceding the Class Period.

83.     There was a robust market of widely available non-proprietary alternatives that were less expensive and performed better. Non-conflicted third-party plan fiduciaries adopted superior alternative investments (that were unaffiliated with MassMutual) at far higher rates than the MM Funds.  Below are some examples:

| MM Fund Name versus Comparator | Average Annual Performance | | | Expense Ratio | Fund Assets ($M) |
|---|---|---|---|---|---|
| | 3-year | 5-year | 10-year | | |
| MassMutual Select Blue Chip Growth Fund | 27.2% | 22.82% | 19.24% | 0.63% | $4,296 |
| AB Large Cap Growth Fund | 32.5% | 25.7% | 20.82% | 0.52% | $20,483 |
| Vanguard U.S. Growth Fund | 32.38% | 25.56% | 20.03% | 0.28% | $52,611 |
| Vanguard Russell 1000 Growth | 33.95% | 25.20% | 19.68% | 0.07% | $11,997 |
| | | | | | |
| MassMutual Select Fundamental Value Fund | 17.4% | 10.71% | 12.13% | 0.65% | $616 |
| Dodge & Cox Stock Fund | 20.8% | 14.1% | 15.6% | 0.41% | $96,695 |
| MFS Value Fund | 19.3% | 12.6% | 13.7% | 0.45% | $67,832 |
| Vanguard Value Index Fund | 17.6% | 12.5% | 13.7% | 0.04% | $47,450 |
| | | | | | |
| MassMutual Select Equity Opportunities Fund | 20.4% | 15.96% | 15.62% | 0.73% | $810 |
| GMO Quality Fund | 25.31% | 20.59% | 16.19% | 0.48% | $9,134 |
| Vanguard PRIMECAP Fund | 22.3% | 18.4% | 17.6% | 0.31% | $75,956 |
| Vanguard Large-Cap Index Fund | 26.4% | 18.7% | 16.6% | 0.04% | $14,406 |
| | | | | | |
| MassMutual Premier Strategic Emerging Markets | 10.68% | 9.79% | 4.44% | 1.15% | $156 |
| American Funds New World Fund | 19.01% | 14.57% | 9.57% | 0.57% | $59,877 |
| Vanguard Emerging Markets Stock Index Fund | 11.88% | 9.48% | 5.40% | 0.10% | $29,818 |
| Vanguard Emerging Markets Selected Stock Fund | 11.55% | 9.89% | 6.25% | 0.84% | $919 |
| | | | | | |
| MassMutual Select Small Company Value Fund | 20.52% | 10.45% | 11.84% | 0.86% | $296 |
| Bridgeway Small Value Fund | 29.28% | 15.01% | 14.69% | 0.83% | $493 |
| MFS New Discovery Value Fund | 22.96% | 13.73% | 15.08% | 0.83% | $4,310 |

c.    *Lack of Acceptance in the Market (Particularly by Mega Plans)*

84.    Due to their high costs and historically poor performance, the MM Funds have not found wide acceptance in the market among plans of similar size, and the Plan's investment represents a substantial portion of the MM Funds' total assets under management. Of the ten actively-managed MM Funds that remained in the Plan as of year-end 2021, the Plan's stake represented more than 5% of the *total* assets of all but one fund, and as much as 25% or even 30% in some cases:

| Name | Ticker | Plan % Fund Assets (12/31/2021) |
|------|--------|------------------|
| MM Select Fundamental Value Fund (SIA-KY) | MFUZX | 31.7% |
| MM Premier Strategic Emerging Markets Fund (SIA-QY) | MPZSX | 25.0% |
| MM Premier Inflation-Protected and Income Fund (SIA-SM) | MIPZX | 22.2% |
| MM Select Small Company Value Fund (SIA-UY) | MSVZX | 22.0% |
| MM Select Small Cap Growth Equity Fund (SIA-IA) | MSGZX | 18.5% |
| MM Select Equity Opportunities Fund (SIA-TA) | MFVZX | 15.7% |
| MM Select Blue Chip Growth Fund (SIA-CKD) | MBCZX | 8.1% |
| MM Premier Core Bond Fund (SIA-ED) | MCZZX | 7.5% |
| MM Premier High Yield Fund (SIA-EV) | MPHZX | 6.1% |

85.    Prior to their removal, the Plan also held a similarly high concentration of the MM index funds, as shown below:

| Name | Ticker | Plan % Fund Assets (12/31/2016) |
|------|--------|------------------|
| MM MSCI EAFE International Index Fund (SIA-CBZ) | MKRZX | 30.8% |
| MM Russell 2000  Index Fund (SIA-CBK) | MCJZX | 30.5% |
| MM S&P Mid-Cap Index Fund (SIA-CBT) | MDKZX | 14.2% |
| MM S&P 500 Index Fund (SIA-CAA) | MMIZX | 7.4% |

86.     By contrast, the Plan's investment in each of the non-proprietary fund options represents less than 3% of the total assets for each fund, and less than 1% of fund assets in the vast majority of cases. For example, the Plan's investment in the Vanguard Institutional Index Fund only represents 0.167% of the fund's total assets. And as a whole, the Plan's combined investment in the non-proprietary fund options represents less than 0.15% of the funds' total assets.

87.     Moreover, the capital that the MM Funds were able to attract from outside sources did not come from mega plans such as the Plan, but rather from much smaller plans and other investors that lacked the full range of investment alternatives available to the Plan.

88.     Defendants did not prudently and objectively evaluate the MM Funds with an eye single to the interests of the Plan's participants, as the fiduciaries of other similar plans did. Instead, they retained the MM Funds in order to benefit MassMutual and its affiliates.

89.     The Plan's sizeable investment in the MM Funds provided MassMutual a substantial amount of compensation. In 2020 alone, over $7 million in compensation was paid to MassMutual and/or its affiliates because of the Plan's investment in the MM Funds. At that rate, MassMutual has been paid approximately $40 million from the Plan's investment in the MM Funds alone during the Class Period.[5]

90.     Moreover, the Plan's sizeable investment in the MM Funds provided an anchor for the funds that enabled MassMutual to create the illusion of wider market acceptance. But for these self-interested financial and business considerations, and their conflicts of interest, Defendants

---

[5] MassMutual also received additional compensation from the Plan in connection with the MassMutual Guaranteed Investment Account (discussed *infra* at § IV.D.3) and the recordkeeping fees that were charged to the Plan (discussed *infra* at § IV.D.5).

would not have retained the MM Funds in the Plan and would not have caused the Plan to invest hundreds of millions of dollars in the MM Funds.

        3.    Retention of Inferior Guaranteed Account Product from MassMutual

91.    In addition to the MM Funds, the Plan's investment lineup also included (and continues to include) a proprietary investment called the MassMutual Guaranteed Investment Account ("MM GIA").

92.    The MM GIA is the Plan's largest holding and serves as the Plan's stable value fund. There are no other stable value fund options available in the Plan.

93.    A stable value fund seeks to preserve the value of the participant's capital while providing a reasonable rate of return.

94.    The MM GIA is a benefit contract between the Plan and Mass Mutual. Pursuant to the contract, Plan assets invested in the MM GIA are transferred into MassMutual's general account (i.e., its general business account). In the past six years, well over $1 billion of Plan assets invested in the MM GIA have been transferred into MassMutual's general account.

95.    MassMutual earns compensation on the assets the Plan invests into its general account. The amount of compensation MassMutual earns from Plan assets invested in the general account is not disclosed to Plan participants and is not fixed by contract. On information and belief, MassMutual earns millions of dollars per year from the Plan's investment in its general account.

96.    Once the Plan's assets are in MassMutual's general account, the assets are subject to claims from MassMutual's creditors, and are used for MassMutual's business operations.

97.    In exchange for this transfer of assets, MassMutual agrees to provide the Plan a rate of return that it sets unilaterally (referred to as the crediting rate). MassMutual sets the crediting rate it is willing to pay each half year.

98.    The difference between what MassMutual earns on the Plan's assets through its general account, and what it pays via the crediting rate, is called the "spread" and represents an expense of the MM GIA. This expense was unreasonable, as the consideration that MassMutual retained in connection with Plan assets invested in the MM GIA exceeded an adequate amount.

99.    The crediting rate that MassMutual set for the Plan also was artificially low. MassMutual provided other retirement plans much higher crediting rates than it provided the Plan.

100.    For instance, MassMutual sponsors a product called the MassMutual Separate Account Guaranteed Interest Contract ("SAGIC"). Like the MM GIA, the SAGIC is designed to preserve a retirement plan's invested capital through guarantees provided by MassMutual and pay a crediting rate that it periodically sets. The nature of the two investments is materially identical.

101.    The only relevant difference is that assets held in the SAGIC are held in MassMutual separate accounts rather than MassMutual's general account. This prevents MassMutual from exposing SAGIC assets to claims from its creditors and general business use. As a result, the SAGIC bears less credit risk than the MM GIA.

102.    Despite the SAGIC exposing investors to fewer risks than the MM GIA—while providing the same capital preservation feature—MassMutual paid SAGIC investors a higher crediting rate than it paid to the Plan via the MM GIA. The table below compares the annualized crediting rate MassMutual paid the Plan through the MM GIA and the crediting rate paid to SAGIC investors.

| Year | MM GIA CR | SAGIC CR |
|------|-----------|----------|
| 2015 | 3.4% | 3.70% |
| 2016 | 3.3% | 3.70% |
| 2017 | 3.3% | 3.90% |
| 2018 | 3.1% | 3.79% |
| 2019 | 3.1% | 3.66% |
| 2020 | 3.0% | 3.59% |

103.    Had Defendants replaced the MM GIA with the SAGIC, the Plan and its participants would have earned approximately $30 million more in retirement savings in the past six years.

104.    In addition to the SAGIC, the marketplace was replete with other, unaffiliated stable value fund products that offered better terms.  For example, other insurance companies offered stable value products that were backed by their general account assets. The crediting rates that these other insurance companies provided far exceeded what MassMutual credited the Plan through the MM GIA. Below are two such examples.

| Insurer | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 |
|---------|------|------|------|------|------|------|------|
| Northwestern Mutual | 5.00% | 5.00% | 5.00% | 4.90% | 5.00% | 5.44% | 5.58% |
| Jackson National | 3.75% | 4.00% | 4.13% | 4.50% | 4.63% | 4.75% | 5.00% |
| MassMutual | 3.00% | 3.00% | 3.10% | 3.10% | 3.23% | 3.33% | 3.40% |

105.    These examples are illustrative, but certainly not exhaustive. Additional insurance company-sponsored stable value fund products offer more favorable terms than MM GIA.

106.    Given the Plan's substantial position in the MM GIA, the Plan would have earned nearly $100 million more had it earned the average crediting rate paid by other insurance companies. And earnings foregone by the Plan through the GIA are profit for MassMutual.

107.    Defendants' retention of the MM GIA as the Plan's stable value investment was not prudent or in the best interest of the Plan's participants.  Defendants retained the MM GIA in the Plan in order to provide significant additional working capital to MassMutual and generate significant additional income for MassMutual, while offering meager returns to the Plan's participants in comparison to other available investments.

4.    Failure to Obtain Best Terms for Non-Proprietary Funds Consistent with the Plan's Size and Bargaining Power

108.    Defendants also failed to exercise appropriate care with respect to the non-proprietary investment options that they maintained in the Plan. Specifically, Defendants retained unaffiliated mutual funds for the Plan that were available through the MassMutual GAC but more expensive than materiality identical alternatives available directly from unaffiliated managers.

109.    Due to the Plan's substantial assets and bargaining power, it had access to cheaper investment vehicles and share classes for certain unaffiliated investment options in the Plan than what Defendants retained through the MassMutual GAC.

110.    For example, the Plan had sufficient assets to qualify for the CIT version of the Plan's current target date suite. Except for cost, Vanguard's target date CITs are materially identical to the mutual fund versions made available to the Plan, and both invest in the same underlying assets. The Plan could have saved .025% of each dollar invested in the target date funds if Defendants had replaced the Plan's current target date funds with their CIT alternatives.  It was not prudent or in the best interest of the Plan's participants and beneficiaries to forego these potential savings.

111.    The Plan also had sufficient assets under management to qualify for a less expensive share class of the Vanguard Total International Stock Index Fund than Defendants

utilized in the Plan. Other than the cost, there is no difference between the two share classes, and a prudent fiduciary exercising appropriate care would not have retained the more expensive share class.

112.    The following table shows the unaffiliated investment options in the Plan for which a less expensive, yet materially identical alternative existed. Defendants' failure to replace the below funds with their less expensive alternative caused and continues to cause the Plan to pay over $150,000 more in fees and expenses than necessary each year.

| Name | Expense Ratio | Alternative Vehicle/Share Class | Expense Ratio |
|---|---|---|---|
| Invesco Oppenheimer International Growth Fund (SIA-CHX) | 0.70% | Invesco OFI International Growth Trust | 0.63% |
| Invesco Oppenheimer Real Estate I Fund (SIA-CMG) | 0.78% | Invesco Equity Real Estate Securities Trust | 0.46% |
| Vanguard Total International Stock Index Fund (SIA-JG5) | 0.08% | Total International Stock Index Fund Institutional Plus Shares | 0.07% |
| Vanguard Instl Trg Retire 2010 (SIA-JCE) | 0.08% | Vanguard Target Retire Trust Plus 2010 | 0.055% |
| Vanguard Instl Target Retire 2065 Fund (SIA-JRY) | 0.08% | Vanguard Target Retire Trust Plus 2065 | 0.055% |
| Vanguard Instl Target Retire 2060 Fund (SIA-JCO) | 0.08% | Vanguard Target Retire Trust Plus 2060 | 0.055% |
| Vanguard Instl Target Retire 2055 Fund (SIA-JCN) | 0.08% | Vanguard Target Retire Trust Plus 2055 | 0.055% |
| Vanguard Instl Target Retire 2050 Fund (SIA-JCM) | 0.08% | Vanguard Target Retire Trust Plus 2050 | 0.055% |
| Vanguard Instl Target Retire 2045 Fund (SIA-JCL) | 0.08% | Vanguard Target Retire Trust Plus 2045 | 0.055% |
| Vanguard Instl Target Retire 2040 Fund (SIA-JCK) | 0.08% | Vanguard Target Retire Trust Plus 2040 | 0.055% |
| Vanguard Instl Target Retire 2035 Fund (SIA-JCJ) | 0.08% | Vanguard Target Retire Trust Plus 2035 | 0.055% |
| Vanguard Instl Target Retire 2030 Fund (SIA-JCI) | 0.08% | Vanguard Target Retire Trust Plus 2030 | 0.055% |
| Vanguard Instl Target Retire 2025 Fund (SIA-JCH) | 0.08% | Vanguard Target Retire Trust Plus 2025 | 0.055% |

| Name | Expense Ratio | Alternative Vehicle/Share Class | Expense Ratio |
|---|---|---|---|
| Vanguard Instl Target Retire 2020 Fund (SIA-JCG) | 0.08% | Vanguard Target Retire Trust Plus 2020 | 0.055% |
| Vanguard Instl Target Retire 2015 Fund (SIA-JCF) | 0.08% | Vanguard Target Retire Trust Plus 2015 | 0.055% |
| Vanguard Instl Target Income Fund (SIA-JCD) | 0.08% | Vanguard Target Retire Trust Plus Income | 0.055% |

113.    Defendants did not need to scour the market to identify these less expensive investment alternatives. To the contrary, MassMutual was already aware of them. In connection with its recordkeeping business, MassMutual made the cheaper share classes and vehicles for these Vanguard investments available to unaffiliated third-party plans with fewer assets under management. However, Defendants inexplicably failed to utilize these less expensive share classes and vehicles for the Plan.

5.    Failure to Prudently Monitor and Control Recordkeeping Expenses

114.    In addition to being compensated through the MM Funds and the MM GIA, MassMutual earned compensation from the Plan for serving as the Plan's recordkeeper.

115.    From the start of the Class Period until January 1, 2021, MassMutual's Workplace Solutions—a division of its retirement business—served as the Plan's recordkeeper and provided recordkeeping services to the Plan.

116.    MassMutual was directly compensated for these services at an average rate of $46 per participant per year, and withdrew this compensation from participants' accounts in the Plan.

117.    Starting January 1, 2021, Empower Retirement became the Plan's recordkeeper as a result of MassMutual selling its retirement business to Empower. On information and belief, the sale price was tied to the amount of assets being acquired (including the Plan's assets).

118.    Empower was directly compensated for the recordkeeping services it provided at an average rate of $40 per participant per year, and was paid this compensation from participants' accounts in the Plan.

119.    In May 2022, MassMutual announced that it was dropping Empower as recordkeeper for the Plan and replacing it with Fidelity. In a statement to a retirement plan publication, a MassMutual spokesperson stated, "As a matter of practice and to uphold our fiduciary responsibility, last year we issued a request for proposal for our retirement plans, which led us to make the decision to transition to a new recordkeeping service provider."

120.    Defendants decided to issue an RFP and select a new recordkeeper only *after* the compensation for recordkeeper services would no longer go to MassMutual and *after* MassMutual had been compensated by Empower for selling its recordkeeping business to Empower.

121.    Fidelity was able to provide recordkeeping services to the Plan for less than Defendants agreed to pay MassMutual and Empower. After MassMutual issued its RFP, Fidelity agreed to provide recordkeeping services to the Plan for $33 per participant per year, while maintaining at least the same level of service.

122.    There is no reason that Defendants could not have procured recordkeeping services for a similar or lower rate before 2022.  The *Gordon* settlement that became effective in December 2016 called for Defendants to procure recordkeeping services for the Plan for no more than $35 per participant per year. *See supra* at ¶ 34.  And Fidelity has entered into a stipulation in another class action case in this District stating that a "plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity … could have obtained recordkeeping services" from

Fidelity for $21 per participant in 2014 and even lower amounts in subsequent years. *See Moitoso v. FMR LLC*, No. 1:18-cv-12122, ECF No. 138-67 at 3-4 (D. Mass.).

123.    Fidelity's ability to profitably provide the Plan recordkeeping services at a lower rate than Defendants caused the Plan to pay MassMutual and Empower reveals that Defendants were enriching MassMutual at the Plan's expense, and were not prudently monitoring and controlling the Plan's recordkeeping expenses. The fact that Defendants did not conduct an RFP for recordkeeping services prior to retaining Fidelity further illustrates Defendants' failure to adhere to their fiduciary obligations in this regard.

6.    Failure to Address Bloated Plan Costs

124.    Defendants' failure to control both investment and recordkeeping expenses has had a significant adverse impact on the Plan's overall expenses.

125.    According to a comprehensive survey of total plan costs conducted by Brightscope and the Investment Company Institute in 2018, the average total plan cost for mega-plans in 2018 was .24% of the plan's assets.

126.    If the cost of the MM GIA—the Plan's largest holding—is set aside, the Plan's total cost in 2018 was .44% in 2018. Considering the cost of MM GIA, the Plan's total cost is estimated to be at least .53% in 2018, more than double the average. A total cost rate of 0.53% exceeds the total cost of substantially all other 401(k) plan with as many assets as the Plan: 90% of mega-plans have a total cost rate of .45% or less.

127.    The Plan's total costs are closer to the rate experienced by plans with 1/5[th] the assets of the Plan. This is consistent with the market of smaller retirement plans MassMutual typically serves.

128.    Had Defendants prudently and loyally considered unaffiliated alternative service providers for the Plan and merely obtained an average cost structure, the Plan would have saved millions of dollars each year.

7.    Broken and Conflicted Fiduciary Process

129.    The foregoing fiduciary failures reflect a broken fiduciary process that was neither prudent nor designed to serve the interest of the Plan and its participants. Instead, Defendants consistently acted to benefit MassMutual.

130.    A prudent and loyal fiduciary would not have tied a mega plan like the Plan to the ill-fitting MassMutual GAC, would not have retained the MM Funds or MM GIA as Plan investments, would not have allowed the Plan to overpay for non-proprietary funds, and would not have allowed the Plan to pay excessive recordkeeping costs and total Plan costs. Instead, a prudent and loyal fiduciary would have leveraged the Plan's size and bargaining power, considered and adopted alternative investments that offered better returns and/or lower expenses, and would have taken more aggressive measures to reduce the Plan's recordkeeping expenses and overall expenses.

131.    Moreover, the following facts (among others) additionally support an inference of a broken and conflicted fiduciary process:

a.    The Plan is the subject of an ongoing DOL investigation;

b.    The Plan also was the subject of a prior lawsuit alleging shortcomings in Defendants' fiduciary processes and improper self-dealing;

c.    Defendants only removed the Plan's proprietary index funds in the wake of the prior lawsuit, and gave a pass to the Plan's actively-managed proprietary funds that generated higher fees for MassMutual;

d.    Defendants failed to meet the recordkeeping expense benchmark set forth in the settlement of the prior lawsuit; and

e. Defendants did not conduct an RFP for recordkeeping services until 2022, after MassMutual no longer had a financial stake in the recordkeeping services provided to the Plan.

132. Further, it is reasonable to draw an adverse inference from the fact that neither Defendants not the Plan Administrator have provided Plaintiff with requested documentation relating to the Plan pursuant to her duly-issued request for Plan documents pursuant to 29 U.S.C. § 1024. This information should have been provided as required by law, and presumably would have been provided if Defendants had nothing to conceal.

**E.     Lack of Prior Knowledge of Defendants' Fiduciary Misconduct**

133. Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Among other things, Plaintiff lacked information regarding the client base for the MassMutual GAC, the availability of less expensive alternative investments to those in the Plan, the costs of the Plans' investments compared to those in similarly-sized plans, investment performance versus other available alternatives, the excessiveness of the Plan's recordkeeping costs compared to alternative service providers, the availability of less expensive share classes of investments held by the Plans, the availability of less expensive separate accounts and collective trust alternatives, and comparisons of the Plans' overall costs to the costs of other similarly-sized plans.

134. Plaintiff also did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan's investments, and Defendants' processes for selecting and monitoring the Plan's recordkeeper, because this information is solely within the possession of Defendants prior to discovery. In bringing her claims in this action, Plaintiff relies

on reasonable inferences from the facts outlined above, but does not have actual knowledge of Defendants' fiduciary processes based on firsthand knowledge.

## V.     PLAN AND CLASS REPRESENTATION

135.     Plaintiff brings this action derivatively on behalf of the Plan pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), and is qualified and adequate to do so as a Plan participant.

136.     Plaintiff also brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class:[6]

> All participants and beneficiaries in the MassMutual Thrift Savings Plan at any time on or after December 4, 2016, excluding any individual defendants and any other persons with responsibility for the Plan's investment or administrative functions.

137.     Class certification is appropriate under Federal Rule of Civil Procedure 23(a).

138.     **Numerosity**. The Class satisfies the numerosity requirement because it is composed of thousands of persons. The Plan currently has more than 24,535 participants. The number of Class members is so large that joinder of all its members is impracticable.

139.     **Commonality.** This case presents numerous common questions of law and fact, including:

(a)     Whether Defendants were and are ERISA fiduciaries with respect to the Plan;

(b)     Whether Defendants breached their ERISA fiduciary duties under 29 U.S.C. § 1104 by engaging in the conduct described herein;

(c)     Whether the Defendants caused the Plan to engage in prohibited transactions in violation of 29 U.S.C. § 1106;

---

[6] Plaintiff reserves the right to propose other or additional classes or subclasses in her motion for class certification or subsequent pleadings in this action.

(d)     Whether Defendants are liable as co-fiduciaries under 29 U.S.C. § 1105 for the unlawful conduct of their co-defendants;

(e)     Whether MassMutual and Defendant Crandall adequately monitored their appointees with fiduciary responsibilities relating to the Plan;

(f)     The proper form of equitable and injunctive relief; and

(g)     The proper measure of monetary relief.

140.    **Typicality.** Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff participated in the Plan and suffered harm as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members with respect to the Plan, and their unlawful conduct affected all Plan participants similarly. Moreover, to the extent that Plaintiff seeks relief on behalf of the Plan pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2), her claims are not only typical of, but the same as, a claim brought by any other Class member on behalf of the Plan.

141.    **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the Class, and her interests are aligned with the Class she seeks to represent. Plaintiff is committed to the vigorous representation of the Class, and has retained counsel experienced in class action and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with the interests of the Class that would impair or impede her ability to represent the Class.

142.    Class certification is also appropriate under Federal Rule of Civil Procedure 23(b).

(a) **Rule 23(b)(1) requirements.** As an ERISA breach of fiduciary duty action, this action is a classic Rule 23(b)(1) class action. Prosecution of separate actions by individual members would create the risk of (i) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards

of conduct for Defendants, or (ii) adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

(b) **Rule 23(b)(2) requirements**. Additionally or alternatively, class certification is appropriate under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

(c) **Rule 23(b)(3) requirements**. Additionally or alternatively, this action is suitable to proceed as a class action under Rule 23(b)(3) because questions of law and fact common to the members of the Class predominate over individual questions, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter. Moreover, the amount of each Class member's personal losses is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class member on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices, and management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## VI.    CAUSES OF ACTION

### COUNT I
### Breaches of Fiduciary Duties in Violation of ERISA § 404, 29 U.S.C. § 1104

143.    Plaintiff restates and incorporates the allegations of the preceding paragraphs of this Complaint as if set forth fully herein.

144.    Defendants were fiduciaries of the Plan during the Class Period, and were subject to ERISA's fiduciary duties of loyalty and prudence under 29 U.S.C. § 1104(a)(1)(A) and (B) with respect to decisions relating to the Plans' investments, recordkeeping function, and expenses.

145.    Defendants breached their fiduciary duties by engaging in the acts and omissions described herein, including: (1) using the MassMutual GAC, which was not designed for mega plans such as the Plan, for self-interested business reasons; (2) retaining inferior mutual funds affiliated with MassMutual, failing to properly monitor those funds, and failing to timely and adequately consider alternatives to those funds; (3) retaining an inferior Guaranteed Investment Account product from MassMutual, failing to monitor the MM GIA, and failing to consider alternatives to the MM GIA; (4) failing to obtain the best terms for non-proprietary funds consistent with the Plan's size and bargaining power; (5) failing to prudently monitor and control recordkeeping expenses; (6) failing to address bloated overall Plan costs; (7) engaging in a broken and conflicted fiduciary process that  benefitted MassMutual at the expense of Plan participants and beneficiaries; and (8) improperly giving preferential treatment to Mass Mutual investment products and services; and (9) causing or allowing the Plan to engage in prohibited transactions.

146.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, the Plan and its participants and beneficiaries have suffered millions of dollars of losses.

147.    Pursuant to 29 U.S.C. § 1109(a), §1132(a)(2) and §1132(a)(3), Defendants are jointly and severally liable for all losses to the Plan resulting from these fiduciary breaches, and MassMutual must restore all profits that it made (directly or through its affiliates) through use of the Plan's assets or on account of these fiduciary breaches. In addition, Defendants are liable for other equitable relief as set forth in Plaintiff's Prayer for Relief.

148.    Each Defendant is also liable for the foregoing relief pursuant to 29 U.S.C. § 1105(a). Each Defendant knowingly participated in each breach of the other Defendants, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**Count II**
**Prohibited Transactions in Violation of ERISA § 406(a), 29 U.S.C. § 1106(a)**

149.    Plaintiff restates and incorporates the allegations of the preceding paragraphs of this Complaint as if set forth fully herein.

150.    MassMutual and its affiliates, including MML Investment Advisers, LLC, are parties-in-interest to the Plan as defined in 29 U.S.C. § 1002(14).

151.    Defendants caused the Plan to engage in multiple prohibited transactions during the Class Period with parties-in-interest (including MassMutual and MML Investment Advisers, LLC) in violation of 29 U.S.C. § 1106(a). These prohibited transactions included the direct or indirect (a) sale or exchange of property between the Plan and such parties-in-interest; (c) furnishing of goods or services between the Plan and such parties-in-interest; and (d) transfer of assets of the Plan to such parties-in-interest.

152.    Defendants knew or should have known of the existence and unlawfulness of such party-in-interest transactions.

153.    Pursuant to 29 U.S.C. § 1109(a), §1132(a)(2) and §1132(a)(3), Defendants are jointly and severally liable for all losses to the Plan resulting from these prohibited transactions, and MassMutual must restore all profits that it made (directly or through its affiliates) through use of the Plan's assets or on account of these prohibited transactions. In addition, Defendants are liable for other equitable relief as set forth in Plaintiff's Prayer for Relief.

**Count III**
**Prohibited Transactions in Violation of ERISA § 406(b), 29 U.S.C. § 1106(b)**

154.    Plaintiff restates and incorporates the allegations of the preceding paragraphs of this Complaint as if set forth fully herein.

155.    Defendants were fiduciaries of the Plan during the Class Period.

156.    Fiduciary self-dealing is prohibited by 29 U.S.C. § 1106(b). Among other things, a fiduciary may not "deal with the assets of the plan in his own interest or for his own account," 29 U.S.C. § 1106(b), and may not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3).

157.    Defendants violated 29 U.S.C. § 1106(b) because (1) Defendants made decisions about the investment of Plan assets in ways that benefitted themselves or were in their own self-interest; (2) MassMutual dealt with the Plan in its own interest in connection with the MassMutual GAC, MM Funds, MM GIA, and recordkeeping services furnished to the Plan; (3) MassMutual received consideration from Plan assets, or in connection with transactions involving the assets of the Plan; and (4) Crandall and other the Committee members were executives of the Company

who were compensated by MassMutual and who stood to gain from the Plan's transactions with MassMutual.

158.    Pursuant to 29 U.S.C. § 1109(a), §1132(a)(2) and §1132(a)(3), Defendants are jointly and severally liable for all losses to the Plan resulting from these prohibited transactions, and MassMutual must restore all profits that it made (directly or through its affiliates) through use of the Plan's assets or on account of these prohibited transactions. In addition, Defendants are liable for other equitable relief as set forth in Plaintiff's Prayer for Relief.

## Count IV
## Failure to Monitor Other Fiduciaries

159.    Plaintiff restates and incorporates the allegations of the preceding paragraphs of this Complaint as if set forth fully herein.

160.    As alleged above, MassMutual appointed the Committee members through its Chairman and CEO, Defendant Crandall, and also had the authority to remove those Committee members. In addition, MassMutual had the authority to relieve Defendant Crandall of his fiduciary obligations relating to the Plan.

161.    Given MassMutual's overall responsibility for the Plan, and its authority to appoint and remove Committee members and Defendant Crandall, MassMutual had a fiduciary responsibility to monitor the performance the Committees and their members, as well as Defendant Crandall, to ensure that they were performing their fiduciary responsibilities properly and in accordance with ERISA, and to take prompt and effective remedial action in the event that they failed to do so.

162.    MassMutual breached its fiduciary monitoring duties by, among other things:

(a)    Failing to appropriately monitor and evaluate the performance of the other Plan fiduciaries or have a system in place for doing so;

(b)    Failing to monitor the processes by which Plan investments and service providers were selected, monitored, and retained, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein;

(c)    Failing to monitor the processes by which the Plan's investment expenses, recordkeeping expenses, and overall expenses were monitored and controlled, which also would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein;

(d)    Failing to remove fiduciaries whose performance was inadequate; and

(e)    Failing to take meaningful steps to avoid or mitigate conflicts of interest on the part of the other Plan fiduciaries.

163.    Pursuant to 29 U.S.C. § 1109(a), §1132(a)(2) and §1132(a)(3), MassMutual is liable for all losses to the Plan resulting from the unlawful fiduciary conduct that it failed to monitor or address, and must restore all profits that it made (directly or through its affiliates) on account of such unlawful fiduciary conduct.  In addition, MassMutual is liable for other equitable relief as set forth in Plaintiff's Prayer for Relief.

164.    Given his personal role in appointing Committee members, Defendant Crandall also had a duty to monitor the Committee members, but breached that duty, rendering him similarly liable for all losses to the Plan resulting from the unlawful fiduciary conduct that he failed to monitor or address, and other appropriate relief as set forth in Plaintiff's Prayer for Relief.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Plan and the Class, respectfully requests the following relief:

a.      An order that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) or (b)(3) of the Federal Rules of Civil Procedure;

b.      Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

c.      A declaration that Defendants breached their fiduciary duties and caused the Plan to engage in prohibited transactions in the manner described herein;

d.      An order compelling Defendants to make good to the Plan all losses resulting from the fiduciary breaches and prohibited transactions described herein;

e.      An order compelling MassMutual to restore all profits that it made (directly or through its affiliates) through the use of Plan's assets or on account of the fiduciary breaches and prohibited transactions described herein;

f.      An order requiring MassMutual to provide all accountings necessary to determine the profits that it made (directly or through its affiliates) through the use of Plan's assets or on account of the fiduciary breaches and prohibited transactions described herein;

g.      Equitable liens on all ill-gotten profits obtained by MassMutual;

h.      An order granting equitable restitution and/or other appropriate equitable monetary relief including, but not limited to, imposition of a constructive trust on all assets of the Plan transferred to MassMutual or its affiliates, or a surcharge to prevent unjust enrichment from unlawful conduct involving the Plan;

i.      An injunction removing fiduciaries who have breached their fiduciary duties or engaged in other unlawful conduct as described herein;

j.   An order appointing an independent fiduciary to manage the assets of the Plan;

k.   An injunction requiring all Plan fiduciaries to comply with ERISA on a going-forward basis;

l.   Other equitable relief to address Defendants' unlawful practices and enforce the provisions of ERISA as may be appropriate;

m.   An award of pre-judgment interest on any amounts Defendants are ordered to pay in this action;

n.   An award of attorneys' fees, expenses and/or taxable costs, as provided by 29 U.S.C. § 1132(g), the common fund doctrine, and/or other applicable authority; and

o.   Such other relief as the Court deems just and proper.

November 9, 2022                              Respectfully submitted,


                                             /s/*Michelle C. Yau*
                                             Michelle C. Yau (#657236)
                                             Daniel R. Sutter (*pro hac vice forthcoming*)
                                             Cohen Milstein Sellers & Toll PLLC
                                             1100 New York Ave. NW ● Fifth Floor
                                             Washington, DC 20005
                                             Tel.: (202) 408-4600
                                             Fax: (202) 408-4699
                                             myau@cohenmilstein.com
                                             dsutter@cohenmilstein.com


                                             Kai H. Richter (*pro hac vice forthcoming*)
                                             Eleanor Frisch (*pro hac vice forthcoming*)
                                             Cohen Milstein Sellers & Toll PLLC
                                             100 S. Fifth Street ● Suite 1900
                                             Minneapolis, MN 55402
                                             Tel.: (202) 408-4600
                                             Fax: (202) 408-4699
                                             krichter@cohenmilstein.com
                                             efrisch@cohenmilstein.com