UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUDY LALONDE, individually and as a representative of a class of similarly situated persons, and on behalf of the MassMutual Thrift Plan,<br><br>     Plaintiff,<br><br>     v.<br><br>MASSACHUSETTS MUTUAL INSURANCE COMAPNY, ROGER CRANDALL, INVESTMENT FIDUCIARY COMMITTEE, PLAN ADMINISTRATIVE COMMITTEE, and JOHN AND JANE DOES 1-20,<br><br>     Defendants. | Civil Action No. 22-30147-MGM |

<u>MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS
AND PLAINTIFF'S MOTION TO STRIKE</u>
(Dkt. Nos. 21 & 42)

March 29, 2024

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

This action arises out of the management and operation of the MassMutual Thrift 401(k) Plan (the "plan"). Judy Lalonde ("Plaintiff"), a former employee of Defendant Massachusetts Mutual Insurance Company ("MassMutual") and a plan beneficiary, brings this action on behalf of herself and a proposed class of plan beneficiaries against MassMutual, Roger Crandall ("Crandall"), the Investment Fiduciary Committee, the Plan Administrative Committee, and John and Jane Does 1-20 (collectively, "Defendants"), alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

Plaintiff contends Defendants breached fiduciary duties of prudence and loyalty in violation

of 29 U.S.C. § 1104 (Count I), caused the plan to engage in prohibited transactions with "parties-in-interest" in violation of 29 U.S.C. § 1106(a) (Count II), caused the plan to engage in prohibited self-dealing transactions in violation of 29 U.S.C. § 1106(b) (Count III), and failed to monitor other fiduciaries (Count IV). Defendants assert three arguments justifying dismissal of the complaint. First, they contend Plaintiff's claims are barred by the three-year statute of limitation applied to ERISA actions and codified at 29 U.S.C. § 1113(2). Next, they argue that the settlement agreement in *Gordan, et al. v. Massachusetts Mutual Life Insurance Co., et al.*, No. 3:13-cv-30184-MAP (D. Mass.), a previous class action involving substantially similar allegations about the plan, either bars this action in its entirety or restricts its allegations to those arising after December 3, 2020. Finally, Defendants argue Plaintiff's complaint fails to plausibly state a claim upon which relief may be granted requiring dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the following reasons, the court concludes Plaintiff's complaint must be dismissed in its entirety. Counts II and III are barred by the three-year statute of limitation governing ERISA actions. Counts I and IV are restricted by the *Gordan* settlement agreement to alleged conduct arising after December 3, 2020. Accordingly, when then reviewed in context, Counts I and IV fail to plausibly state a claim upon which relief may be granted. Accordingly, this action is dismissed.[1]

## II. FACTUAL BACKGROUND[2]

Plaintiff was employed by MassMutual from 2004 until 2021. As a MassMutual employee, she was entitled to join the MassMutual Thrift Plan (the "plan"). The plan is a defined contribution 401(k) intended to help MassMutual employees save money and prepare for retirement. Plan participants can select from an array of MassMutual affiliated and non-MassMutual affiliated funds within the plan's

---

[1] Plaintiff filed a motion to strike an exhibit annexed to Defendants' reply brief. (Dkt. No. 42.) The court found it unnecessary to consider this exhibit, that motion is denied as moot.

[2] Unless otherwise noted, all factual allegations are taken from Plaintiff's complaint. (Dkt. No. 1.)

portfolio depending on their specific investment goals. As of December 2021, the plan had approximately $ 4,100,000,000 in assets and 23,662 participants. Plaintiff is one of these participants. She has invested funds in both MassMutual affiliated and non-MassMutual affiliated products.

MassMutual's management of the plan has come under scrutiny before. In November of 2013, a putative class of MassMutual employees brought an action alleging MassMutual's management of the plan imposed unreasonable record keeping and administrative costs, selected unreasonably priced and imprudent investment options, caused the plan to engage in prohibited transactions, failed to administer the plan in accordance with its governing documents, and failed to monitor fiduciaries. *See Gordan, et al. v. Massachusetts Mutual Life Insurance Co., et al.*, No. 3:13-cv-30184-MAP (D. Mass.). Relying on these allegations, the *Gordan* plaintiffs alleged MassMutual's management of the plan violated ERISA's statutory protections. After three years of litigation, the parties settled on November 3, 2016. After review and approval by an independent fiduciary, Judge Ponsor approved the terms of the settlement. (Dkt. No. 23-2.)[3] This settlement bound MassMutual and a certified class of its employee plan members, including the Plaintiff in this current action. (*Id.* at § 2.9.) According to the settlement, MassMutual agreed to pay $ 30,900,000 into a qualified settlement fund for the benefit of the employee class. (*Id.* at §§ 5-6.) In addition, MassMutual agreed to the appointment of an independent consultant who would have responsibility for evaluating the plan's portfolio and recommending courses of action sufficient to ensure MassMutual met its fiduciary obligations. (*Id.* at § 10.3.) MassMutual also committed to keeping plan recordkeeping costs below $35 a participant, (*Id.* at § 10.4), certified plan fiduciaries would attend annual training led by experienced ERISA counsel and the independent

---

[3] The court may properly consider the terms of the *Gordan* settlement agreement because it is "fairly incorporated within" the complaint. *Rodi v. S. New England Sch. of L.*, 389 F.3d 5, 12 (1st Cir. 2004). Moreover, "judicial notice is properly taken of orders and decisions made by other courts or administrative agencies when the preclusive effect of those decisions is at issue." *O'Hara v. Diageo-Guinness, USA, Inc.,* 306 F. Supp. 3d 441, 457 (D. Mass. 2018), *on reconsideration*, 370 F. Supp. 3d 204 (D. Mass. 2019) (internal quotation omitted).

consultants, (*Id.* at § 10.6), and agreed to a number of structural changes intended to ensure plan fiduciaries received independent advice, (*Id.* at §§ 10.7-10.12.)

In return for agreeing to the settlement payments and fiduciary process related improvements, MassMutual received releases from each of the *Gordan* class members. (*Id.* at §§ 8.1-8.2.) Specifically, the *Gordan* class agreed not to bring any further actions related to or arising out of the plan. (*Id.* at § 2.37.) The settlement further provided that the district court would maintain jurisdiction over violations of the agreement from December 3, 2016 (the effective date of the settlement) until December 3, 2020. (*Id.* at § 10.13.) During this four-year period, *Gordan* class counsel had sole authority to bring an action to enforce the agreement, (*Id.* at § 13.5), by following the procedures established in the settlement, (*Id.* at § 13.7.)

According to Plaintiff, on December 4, 2016, just hours after the *Gordan* settlement took effect, MassMutual began violating its ERISA obligations by once again failing to offer prudent investment options and failing to meet fiduciary obligations of loyalty. For context, MassMutual invests all plan assets through its proprietary "Group Annuity Contract SF 1550-1" (the "GAC"). As of December 31, 2016, the GAC contained at least fourteen proprietary mutual funds managed by a MassMutual subsidiary, MML Investment Advisors, LLC.[4] These proprietary funds had expense ratios that were between 0.12% and 0.19% higher than the rate charged by collective investment trusts (another common kind of pooled investment product) operated by MassMutual for the benefit of the open market. MassMutual's proprietary mutual funds also charged expense ratios slightly higher than industry average as calculated by two industry surveys. The GAC also contained MassMutual affiliated index funds. These index funds carried expense ratios higher than those charged by index funds

---

[4] These funds are "sub-advised funds." This means a third-party investment firm dictates how the assets are invested in return for a portion of the fees charged to the fund. According to Plaintiff, T. Rowe Price Associates, Inc., Loomis, Sayles & Company, L.P., and Invesco Advisors, Inc. manage the day-to-day investment strategy of the funds.

operated by MassMutual competitors. Despite these higher expense ratios, the MassMutual funds marginally underperformed both benchmark indices and rival funds over 3-year, 5-year, and 10-year periods.

In addition to the proprietary mutual funds, the plan also includes a MassMutual affiliated Guaranteed Investment Account ("GIA"). The GIA is a "stable value fund." Stable value funds are designed to preserve a plan participant's capital contribution while ensuring a reasonable rate of return. In this case, the plan participant's capital is placed into the GIA which is then invested in MassMutual's general business account. In return, the plan receives a set rate of return on investment, called a "crediting rate," which is fixed by MassMutual and designed to ensure a stable return on investment for the cautious investor. The GIA is not MassMutual's only stable value fund. It also offers the Separate Account Guaranteed Interest Contract ("SAGIC"). As the name suggests, SAGIC is similar to the GIA, but instead of investing the proceeds in MassMutual's general business account, the funds go into a separate account. From 2015 to 2020, MassMutual's SAGIC offered a crediting rate that was between 0.3% and 0.69% higher than the crediting rate offered by the GIA. Additionally, other insurance companies offer stable value funds on the open market. Plaintiff points to two such funds, one operated by Northwestern Mutual and the other by Jackson National. From 2015 to 2021 these funds had crediting rates that fluctuated between 0.75% and approximately 2.5% higher than the GIA's rate. Plan participants are only able to invest in the GIA, they have no option to invest in the SAGIC or third-party stable value funds. However, MassMutual proprietary products are not the only investment options in the plan. According to the complaint, the plan includes sixteen unaffiliated mutual funds operated by Invesco and Vanguard. In certain cases, these unaffiliated mutual funds have higher expense ratios than those associated with collective investment trusts offered on the open market that are also operated by Invesco and Vanguard.

Operating the plan requires substantial expenditure in the form of recordkeeping fees. In the

*Gordan* settlement, MassMutual agreed to keep plan recordkeeping costs at or below $ 35 per plan participant. According to the complaint, from December 4, 2016 until January 1, 2021, the plan's record keeping costs were $ 46 per plan participant. This money went to MassMutual's Workplace Solutions Division which served as the plan's recordkeeper. On January 1, 2021, Empower Retirement took over as plan recordkeeper for a fee of $ 40 per plan participant. In May 2022, after issuing a request for proposals, MassMutual announced it was replacing Empower with Fidelity. Fidelity charged $ 33 per plan participant; this is the presumptive fee per participant at the time this action commenced.

### III. MOTION TO DISMISS STANDARD

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In evaluating whether dismissal is appropriate under Rule 12(b)(6), the court must credit well-pleaded factual allegations as true and draw all reasonable inferences from those facts in the plaintiff's favor. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 36 (1st Cir. 2013). "Well-pleaded facts must be non-conclusory and non-speculative." *Barchock v. CVS Health Corp.,* 886 F.3d 43, 48 (1st Cir. 2018) (internal quotation omitted). For a claim to proceed, the complaint must allege enough facts to plausibly establish each material element of the claim and to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Pitta v. Medeiros*, 90 F.4th 11, 17 (1st Cir. 2024). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc) (citing *Twombly*, 550 U.S.

at 555). Generally, the court's review is limited to allegations in the complaint, but it "may [also] consider 'implications from documents attached to or fairly incorporated into the complaint,'" *Barchok*, 886 F.3d at 48 (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2005)) (alteration added), as well as "matters of public record, and other matter susceptible to judicial notice," *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020) (quoting *In re Colonial Bankers Corp.*, 324 F.3d 12, 20 (1st Cir. 2003)).

The First Circuit has emphasized "that evaluating the plausibility of a legal claim is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679). In ERISA class actions, the Supreme Court has specifically indicated it views a Rule 12(b)(6) motion as an "important mechanism for weeding out a meritless claims . . . . requir[ing] careful judicial consideration of whether the complaint states a claim that the defendant has acted imprudently." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (alteration added). This context-specific analysis requires the court to recall that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

## IV. DISCUSSION

The court first addresses Defendants' statute of limitation argument because of its potentially dispositive effect on the entire motion. Next, it addresses the preclusive impact of the *Gordan* class settlement agreement before addressing the sufficiency of Plaintiff's complaint because resolution of the issue narrows the universe of allegations relevant to the *Twombly/Iqbal* analysis.

### A.  Statute of Limitations

Defendants contend Plaintiff's claims are barred by ERISA's statute of limitations and that this is obvious from the face of the complaint, thereby justifying dismissal. According to 29 U.S.C. § 1113, any action for violation of a fiduciary's statutory obligations must be brought either "six years after the date of the last action which constituted a part of the breach or violation," 29 U.S.C. § 1113(1), or "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation," 29 U.S.C. § 1113(2), whichever date is earlier. The parties' briefing narrows the question to whether Plaintiff had "actual knowledge" sufficient to trigger Section 1113(2)'s three-year statute of limitations. *See Intel Corp. Inv. Pol'y Comm. v. Sulyma,* 140 S. Ct. 768, 779 (2020). Actual knowledge requires that the "plaintiff knows 'the essential facts of the transaction or conduct constituting the violation.'" *Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133, 142 (1st Cir. 2005)(quoting *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1086 (7th Cir. 1992)); *see also Sulyma v. Intel Corp. Inv. Pol'y Comm.,* 909 F.3d 1069, 1075 (9th Cir. 2018) ("[T]he plaintiff need only be aware that the defendant has engaged in a prohibited transaction, because knowledge of the transaction is all that is necessary to know that a prohibited transaction has occurred."), *aff'd*, 140 S. Ct. 768 (2020). The actual knowledge inquiry is context specific, recognizing "that determining the meaning of complex transactions may take some time," but also that "Congress [did not] intend[] the actual knowledge requirement to excuse willful blindness by a plaintiff." *Edes*, 417 F.3d at 142 (alteration added). Finally, when alleged ERISA violations are "of the same character," Section 1113's statute of limitations begins to run upon the occurrence of the first breach. *See Riley v. Metro. Life Ins. Co.,* 971 F. Supp. 2d 186, 195 (D. Mass. 2013), *aff'd*, 744 F.3d 241 (1st Cir. 2014) (citing *Phillips v. Alaska Hotel & Rest. Emps. Pension Fund*, 944 F.2d 509 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991)).

As to Plaintiff's breach of fiduciary duty claim (Count I) and failure to monitor fiduciaries claim (Count IV), the three-year statute of limitation does not bar this action entirely because, as discussed *infra*, the *Gordan* class settlement restricts Plaintiff to allegations arising after December 3,

2020. Any allegations related to Counts I and IV are necessarily confined to a period commencing approximately two years before this suit was filed on November 9, 2022. Therefore, the claims related to these allegations are not barred by the three-year statute of limitation.

As to Plaintiff's prohibited transaction claims (Counts II/III), the three-year statute of limitations precludes any cause of action. Plaintiff alleges Defendants' decision to utilize MassMutual's Group Annuity Contract, inclusion of MassMutual proprietary funds in the plan, and reliance on MassMutual affiliate MML Investment Advisors, LLC, all caused prohibited transactions to occur in violation of both 29 U.S.C. § 1106(a) and (b). Section 1106(a) prevents a plan fiduciary from causing any transaction to occur between the plan and "party in interest." *See* 29 U.S.C. § 1106(a)(1)(A)-(E). A "party in interest" is defined "to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries." *Id.*; *see also* 29 U.S.C. § 1002 (14). Similarly, Section 1106(b) prevents a fiduciary from engaging in certain self-interested transactions, such as "deal[ing] with the assets of the plan in his own interest or for his own account," Section 1106(b)(1), causing the plan to transact with anyone whose "interests are adverse to the interests of the plan or the interests of its participants or beneficiaries," Section 1106(b)(2), or "receive[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan," Section 1106(b)(3).

Plaintiff's prohibited transactions claims all turn on the plan's inclusion of proprietary funds in the investment lineup. According to Plaintiff, these funds were part of the plan as early as December 31, 2016. (*See* Dkt. No. 1, ¶ 52.) She further acknowledges she invested in the proprietary funds. (*Id.* ¶ 11.) Thus, the complaint expressly alleges the proprietary funds were part of the plan as far back as 2016 and Plaintiff knew this to be true because she had money invested in these proprietary funds. *Cf. Est. of Rosenberg v. Macy's, Inc.,* No. CV 20-11860-MLW, 2022 WL 4547074, at *3-6 (D. Mass. Sept. 29, 2022) (dismissing ERISA action when it was clear plaintiff was aware of the facts giving rise to injury).

In addition, Plaintiff's complaint contains an entire section devoted to listing facts of which she was unaware. Yet, this section does not allege a lack of awareness regarding the plan's use of proprietary funds. Nor would it be plausible for Plaintiff to allege she was unaware of the presence of the proprietary funds in the plan's portfolio when she admittedly invested in the funds.

Plaintiff's knowledge the proprietary funds were in the plan portfolio is sufficient to trigger the accrual of her prohibited transactions claims. In this case, much as in *Edes*, the conduct underlying the claims does "not [arise] from an intricate financial transaction," but rather from the mere inclusion of proprietary funds in the plan. 417 F.3d at 142. Moreover, "[t]he fact that these were proprietary funds would have been immediately known to Plaintiff[], as the funds are labeled as [MassMutual] funds." *In re G.E. ERISA Litig.*, No. 17-CV-12123-IT, 2019 WL 5592864, at *3 (D. Mass. Oct. 30, 2019) (alteration added); *see also Brown v. Am. Life Holdings, Inc.,* 190 F.3d 856, 859 (8th Cir. 1999) (explaining "knowledge of the transaction would be actual knowledge of the breach"); *Patterson v. Cap. Grp. Companies, Inc.*, No. CV174399DSFPJWX, 2018 WL 748104, at *3 (C.D. Cal. Jan. 23, 2018) (applying statute of limitations when the self-interested nature of the transaction was obvious based on the names of the relevant funds). The court, in reaching its conclusion, also considered that Plaintiff was a member of the class in the *Gordan* litigation which turned on similar allegations of self-dealing. Class memberships makes it even more implausible she was unaware the plan contained proprietary funds. Accordingly, Counts II and III are barred by the statute of limitation and will be dismissed.

### B. *Gordan*'s Impact

Defendants contend the *Gordan* settlement agreement's release provision limits Plaintiff to allegations arising after December 3, 2020. Plaintiff argues the release only applies to claims arising before December 3, 2016. The court agrees with Defendants.

"In construing a settlement subsequently adopted by a court, [this court] appl[ies] the same basic rules that govern interpretation of ordinary contracts." *Bishop-Bristol on behalf of Arthur J. Gallagher*

*& Co. 401(k) Sav. & Thrift Plan v. Massachusetts Mut. Life Ins. Co.*, No. CV 16-30082-MGM, 2019 WL 1501581, at *4 (D. Mass. Feb. 5, 2019) (quoting *Nault v. United States*, 517 F.3d 2, 4 (1st Cir. 2008)). In interpreting an ERISA settlement agreement, the court relies upon federal common law, which includes "the 'common-sense canons of contract interpretation' derived from state law." *Morais v. Cent. Beverage Corp. Union Employees' Supplemental Ret. Plan*, 167 F.3d 709, 711-12 (1st Cir. 1999) (internal citation omitted); *see also Parmenter v. Prudential Ins. Co. of Am.,* 93 F.4th 13, 21-22 (1st Cir. 2024).

In agreeing to the *Gordan* settlement, Plaintiff relinquished the right to pursue plan-related claims outside of the context of the *Gordan* settlement procedure between December 3, 2016 and December 3, 2020. Specifically, Section 2.37.2's definition of "Released Claims" covers all the alleged wrongful conduct contained in the complaint.[5] In response, Plaintiff makes two arguments, neither of which disputes that Section 2.37.2's plain language would foreclose any action premised on the allegations in the complaint. The first argument relies on the purported plain language of the *Gordan* settlement as specifically excluding Plaintiff's claims from release. The second argument, claiming

---

[5] This definition forecloses, in relevant part:

> [Claims] [t]hat arise out of, relate to, are based on, or have any connection with: (1) the structure, management, monitoring, servicing, administration, size and/or expenses of the Plans; (2) the selection, monitoring, oversight, retention, fees, expenses, performance of the investment options available under the Plans; (3) the selection, monitoring, oversight, retention, fees, expenses, performance of the Plans' other services or service providers, including without limitations administrative and/or recordkeeping services, (4) fees, costs, or expenses charged to, paid, or reimbursed by, or authorized to be paid or reimbursed by the Plans, (5) disclosures, filings or failures to disclose information regarding the Plans' investment options, fees, expenses, performance, services or service providers, (6) disclosures or failures to disclose relationships among fiduciaries, service providers, and investment managers for the Plans, (7) engaging in self-dealing or prohibited transactions, and/or (8) collecting or being authorized to collect compensation based on a percentage of total assets.

(Dkt. No. 23-2, § 2.37.2.)

support from the statutory text of ERISA, posits interpreting the *Gordan* release as precluding Plaintiff's claims is barred by law. The court finds neither argument is persuasive.

First, Plaintiff contends, in a severely and substantively edited section reference, that the express terms of Section 2.37.6 "specifically exclude . . . claims arising from conduct outside of the Class Period." (Dkt. No. 37 at 37) (alteration in original). However, Section 2.37.6 read in full provides:

> "Released Claims specifically exclude (1) those claims not related to 2.37.2(1)-(8) above; (2) claims of denial of benefits from the Plans; or (3) labor or employment claims unrelated to the Plans, including but not limited to employment discrimination or wrongful termination and claims arising from conduct outside of the Class Period.

Applying "commonsense canons of contract interpretation," *Parmenter*, 93 F.4th at 21, the court concludes the phrase "claims arising from conduct outside of the Class Period" refers to the prefatory clause's mention of "labor or employment claims unrelated to the Plans." This interpretation is supported by the ordinary rules of grammar. Clause three is set off from the preceding two clauses by a semi-colon, and "[u]nlike a comma, the use of a semi-colon before a phrase indicates that the clause is independent from that which precedes it." *Certain Underwriters at Lloyd's Named Individually Herein v. Port Auth. of New York & New Jersey*, No. 05 CV 5239 (BSJ), 2008 WL 11478206, at *6 (S.D.N.Y. Feb. 25, 2008); *see also Analog Techs., Inc. v. Analog Devices, Inc.*, No. 1:21-CV-11334-GAO, 2023 WL 5833122, at *3 (D. Mass. Sept. 8, 2023) (explaining a semi-colon is the proper way to set off truly independent clauses). This interpretation also accords with the "rule of the last antecedent" which "provides that a modifying phrase 'should ordinarily be read as modifying only the noun or phrase that it immediately follows.'" *Coffin v. Bowater Inc.*, 501 F.3d 80, 94 (1st Cir. 2007) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). Consequently, the plain text of the *Gordan* settlement does not support Plaintiff's position that all "claims arising from conduct outside of the Class Period" are excluded from the settlement's release.

In an alternative argument, Plaintiff contends interpreting the *Gordan* release as encompassing prospective ERISA violations arising between December 3, 2016 to December 3, 2020 is prohibited

by 29 U.S.C. § 1110(a). Section 1110(a) provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." However, courts have construed Section 1110(a)'s anti-exculpatory provision as not presenting an obstacle to the settlement of ERISA class actions unless the release aims to eliminate a defendant's fiduciary obligations. *See, e.g., Howell v. Motorola, Inc.,* No. 03 C 5044, 2005 WL 2420410, at \*4 (N.D. Ill. Sept. 30, 2005), *aff'd*, 633 F.3d 552 (7th Cir. 2011) ("[T]o interpret the ERISA provision otherwise would 'assign to Congress the intent of making an unreasonable law—one requiring terminal litigation, rather than favoring settlement as does the general law.'") (quoting *Leavitt v. Nw. Bell Tel. Co.*, 921 F.2d 160, 162 (8th Cir. 1990))); *Bishop-Bristol*, 2019 WL 1501581, at \*5; *Hastings v. Principal Life Ins. Co.*, No. 421CV00047JAJHCA, 2021 WL 6061916, at \*10-12 (S.D. Iowa July 28, 2021).[6]

The *Gordan* settlement agreement does not purport to eliminate Defendants' fiduciary obligations. Instead, Section 10.13 granted the district court jurisdiction to enforce its terms for four years. Section 13.5 granted *Gordan* class counsel the exclusive right to institute an action enforcing the terms of the agreement, while Sections 13.7.1–13.7.5 established the procedures for bringing an enforcement action.[7] These provisions did not eliminate Defendants' ERISA liability. Rather, they

---

[6] In different factual contexts, the First Circuit has upheld the legitimacy of settlement agreements releasing ERISA claims. *Morais v. Cent. Beverage Corp. Union Employees' Supplemental Ret. Plan*, 167 F.3d 709, 715 n. 12 (1st Cir. 1999) (explaining pension calculation claims may be released through settlement agreements).

[7] The settlement agreement's forward looking enforcement mechanism distinguishes this case from *Moitoso*, 451 F. Supp.3d 189, upon which Plaintiff principally relies, because here, the settlement agreement provided the *Gordan* class with a mechanism to challenge Defendants' compliance with the structural requirements of the settlement for a period of four years. *See Hastings*, 2021 WL 6061916, at \*11 (distinguishing *Moitoso*). In the analogous context of consent judgments with forward-looking enforcement mechanisms, courts will dismiss claims brought outside of this mechanism when they fall within the consent judgment's "regime." *Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, 30 F.4th 1079, 1085 (11th Cir. 2022); *see also Barr Inc. v. Studio One, Inc.,* 146 F. Supp. 3d 375, 382-83 (D. Mass.

channeled the method of raising potential liability through the District Judge who approved the settlement when the liability arose from the same predicate as the *Gordan* litigation. Allowing Plaintiff to circumvent this mechanism and launch a collateral attack on the terms of the settlement would entangle plan fiduciaries in perpetual litigation. "To put it another way, it is not reasonable to permit class members to agree to a release of future claims of breach of an ERISA fiduciary duty based on the same practices in order to obtain a benefit, then allow class members subsequently to challenge the release as violating § 1110." *Hastings*, 2021 WL 6061916, at *11.

As a member of the *Gordan* class, Plaintiff's avenue for resolving plan related claims arising between December 3, 2016 and December 3, 2020 was in the manner proscribed by the settlement agreement. Plaintiff did not do so. Rather, Plaintiff waited until the *Gordan* court's period of continuing jurisdiction expired and then filed a second class action relying in substantial part on alleged wrongful conduct occurring during the *Gordan* judicial supervision period. As Defendants correctly articulate, allowing this course of action would undercut the well-developed policy in favor of "facilitating a settlement in a hard-fought, complex class action," *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 36 (1st Cir. 2009), by "make[ing] it impossible, as a practical matter, to settle any ERISA case," *Howell v. Motorola, Inc.,* 633 F.3d 552, 561 (7th Cir. 2011). Accordingly, Plaintiff may only rely on conduct arising after December 3, 2020.

### C. Sufficiency of Counts I and IV

Plaintiff relies on four theories to support an inference that Defendants breached their fiduciary duties. Specifically, she alleges (i) the plan's inclusion of proprietary funds, (ii) the plan's retention of the GIA, (iii) the plan's failure to bargain for less expensive share classes in non-proprietary funds, and (iv) the plan's excessive recordkeeping fees, all give rise to an inference of

---

2015) (noting a consent judgment will have preclusive effect in future litigation between the same parties). Here, Plaintiff's claims fall entirely within the *Gordan* "regime."

breach. However, when properly limited to conduct arising after December 3, 2020, Plaintiff does not plausibly allege breach of fiduciary duty.

Under 29 U.S.C. § 1104(a)(1), managers of employee benefit funds owe fiduciary duties of prudence and loyalty to fund beneficiaries. *See Ellis v. Fid. Mgmt. Tr. Co.,* 257 F. Supp. 3d 117, 126 (D. Mass. 2017), *aff'd,* 883 F.3d 1 (1st Cir. 2018). "These duties of loyalty and prudence are among 'the highest known to the law.'" *Moitoso v. FMR LLC,* 451 F. Supp. 3d 189, 204 (D. Mass. 2020) (quoting *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 598 (8th Cir. 2009)). As to prudence, ERISA requires that "a fiduciary must act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use.'" *Brotherston v. Putnam Invs., LLC,* 907 F.3d 17, 30 (1st Cir. 2018) (quoting 29 U.S.C. § 1104(a)(1)(B)). "The test of prudence—the Prudent [Person] Rule—is one of *conduct,* and not a test of the result of performance of the investment. Whether a fiduciary's actions are prudent cannot be measured in hindsight." *Ellis v. Fid. Mgmt. Tr. Co.,* 883 F.3d 1, 10 (1st Cir. 2018) (internal quotation marks and citation omitted).

As to loyalty, every fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of: providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). "Plaintiffs who claim disloyalty must show that defendants failed to act in the best interests of plan participants and '[i]t is not enough for a plaintiff to identify a potential conflict of interest from the defendant's investment in its own proprietary funds.'" *Turner v. Schneider Elec. Holdings, Inc.,* 530 F. Supp. 3d 127, 134 (D. Mass. 2021) (quoting *Moitoso v. FMR LLC,* 451 F. Supp.3d 189, 204 (D. Mass. 2020)) (bracket in original). As a result, a plaintiff "must demonstrate that 'the fiduciary's subjective motivation' was improper." *Id.*

Plaintiff's theories implicate both the duty of prudence and loyalty. First, Plaintiff challenges MassMutual's use of proprietary funds. However, this alone does not plausibly establish breach because the Department of Labor explicitly blessed the use of proprietary funds so long as the use otherwise complies with ERISA's statutory mandates. *See* PTE 77-3, 42 Fed. Reg. 18734 (Apr. 8, 1977); *see also Moitoso*, 451 F. Supp.3d at 204; *Evans v. Associated Banc-Corp*, No. 21-C-60, 2022 WL 4638092, at *7 (E.D. Wis. Sept. 30, 2022) (finding use of proprietary funds insufficient to plausibly allege breach of fiduciary duty); *Patterson v. Morgan Stanley*, No. 16-CV-6568 (RJS), 2019 WL 4934834, at *13 (S.D.N.Y. Oct. 7, 2019) ("However, a plan fiduciary does not breach its duty of loyalty simply by offering the plan sponsor's financial products . . . ."). Accordingly, Plaintiff must allege something more to sustain this theory.

As further supporting indicia, the complaint claims the proprietary funds perform poorly, are excessively costly, and "have not found wide acceptance in the market among plans of similar size." Poor performance is not sufficient to infer breach because "[t]he test of prudence 'is one of process rather than ultimate investment performance and cannot be measured in hindsight.'" *Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 134 (D. Mass. 2021) (quoting *Velazquez v. Massachusetts Fin. Servs. Co.*, 320 F. Supp. 3d 252, 259 (D. Mass. 2018)). Here, Plaintiff relies on a backwards looking comparison between the proprietary funds and alleged comparator funds which reveals a modest differential in performance. But this is not sufficient because the comparison fails to demonstrate the existence of an imprudent process. Instead, the comparison reflects the inherent vagaries of investing in the market. *See, e.g., Gonzalez v. Northwell Health, Inc.,* 632 F. Supp. 3d 148, 163 (E.D.N.Y. 2022) ("These allegations of underperformance compared to benchmark indices over a relatively short period of time do not support a plausible inference that defendants acted imprudently in retaining these four funds."); *Cho v. Prudential Ins. Co. of Am.,* No. CV1919886JMVSCM, 2021 WL 4438186, at

16

*9 (D.N.J. Sept. 27, 2021) ("Plaintiff has not alleged that the underperformance was sufficiently substantial").

Similarly, Plaintiff's excessive cost allegations do not plausibly support an inference of breach because "[t]he fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Brotherston v. Putnam Invs., LLC*, No. CV 15-13825-WGY, 2017 WL 1196648, at *6 (D. Mass. Mar. 30, 2017), *aff'd in relevant part*, 907 F.3d 17 (1st Cir. 2018) (internal quotation marks omitted). Absent a valid benchmark, Plaintiff fails to plausibly allege excessive costs supporting an inference of breach. Where Plaintiff's complaint provides the expense ratios associated with alleged comparator funds, the differential is minimal. And where the complaint provides seemingly more substantial expense ratio differentials, the comparison is not made to a comparator fund but rather to an "industry average." (*Compare* Dkt. No. 1, ¶¶ 72, 78 *with* ¶¶ 75-76.) Industry average ratios are an insufficient benchmark because "the mere fact that a fund charges an expense ratio higher than the mean or median . . .does not imply that the cost was excessive . . . [o]therwise, by definition, half of all funds would charge excessive fees." *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 268 (S.D.N.Y. 2023).

Finally, Plaintiff alleges the proprietary funds are not commonly found in "mega plans." This allegation is speculative, as Plaintiff fails to advance a factual predicate for the assertion Defendants retained the proprietary funds to "create the illusion of market acceptance." (Dkt. No. 1, ¶ 90.) Plaintiff must provide sufficient factual support to enable the court to evaluate the plausibility of this assertion. Otherwise, the contention is speculative. "But such speculation, which is not based on any concrete or objective facts, is insufficient even at this stage." *Doe v. UMass-Amherst*, No. CV 19-30056-MGM, 2023 WL 8851056, at *22 (D. Mass. Dec. 21, 2023).

Next, Plaintiff alleges Defendants' retention of the GIA further bolsters an inference of breach. Specifically, they claim the GIA's alleged poor performance and the existence of a "materially identical" SAGIC product support an inference of breach. As a general matter, "plans are under no duty to offer any particular type or mix of funds," so the mere fact Defendants offered the GIA but not the SAGIC is insufficient to plausibly allege breach. *Moitoso*, 451 F.Supp.3d at 212-13 (collecting cases). In addition, as explained above, poor performance assessed with the benefit of hindsight is not sufficient to infer breach. *See Barchock*, 886 F.3d at 44-45; *see also White v. Chevron Corp.,* No. 16-CV-0793-PJH, 2016 WL 4502808, at *8 (N.D. Cal. Aug. 29, 2016). Moreover, Plaintiff's own chart indicates, based on the five-year comparative performance of the GIA versus the SAGIC, only a modest superiority on the part of the SAGIC, (Dkt. No. 1, ¶ 102), and to survive a motion to dismiss "the underperformance must be substantial" for a court to plausibly infer the challenged funds retention was imprudent. *Cho,* 2021 WL 4438186, at *9 (quoting *Patterson*, 2019 WL 4934834, at *10); *see also Barchock*, 886 F.3d at 52-53 (explaining even a "radical deviation" from standard practice does not necessarily suffice to allege imprudence); *Leber v. Citigroup 401(K) Plan Inv. Comm.,* 129 F. Supp. 3d 4, 14-15 (S.D.N.Y. 2015) (noting allegations of historically poor or insufficient performance do not plausibly support an inference of breach). Finally, the complaint's assertion "the marketplace was replete with other, unaffiliated stable value fund products that offered better terms" cannot support an inference of breach. (Dkt. No. 1, ¶ 104.) As discussed, plans are under no obligation to offer a particular mix of investment funds. Moreover, simply selecting two alleged comparator funds with higher credit return rates over a seven-year period is the type of hindsight-based allegation which is insufficient to support a plausible inference of breach. Consequently, retention of the GIA does not plausibly support an allegation of breach.

Plaintiff's third theory fares no better. As to non-proprietary plan offerings, she claims Defendants could have obtained less expensive share class offerings based on the MassMutual plan's

superior market power. To support this allegation, Plaintiff provides a list of funds offered by the plan compared side-by-side with supposed comparator funds demonstrating the comparators' lower expense ratios. As Defendants note, fifteen of the sixteen alleged comparators are plainly labelled as collective investment trusts.[8] "These non-mutual fund vehicles differ so much from mutual funds, however, in terms of their regulatory and transparency features that other courts have found it impossible to make an 'apples-to-oranges' comparison of the two." *Moitoso*, 451 F. Supp.3d at 212; *see also Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136 (10th Cir. 2023) ("Without such factual allegations, it is not clear whether the CITs identified in the complaint 'have different aims, different risks, and different potential rewards [justifying comparison with mutual funds].'"); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 581-82 (7th Cir. 2022), *reh'g denied*, No. 21-2789, 2022 WL 4372363 (7th Cir. Sept. 21, 2022) (noting claims relying on perceived cheaper investment options require plaintiff to provide a "meaningful benchmark" for comparison). As the Sixth Circuit noted in *Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022), "[j]ust as comparison can be the thief of happiness in life, so it can be the thief of accuracy when it comes to two funds with separate goals and separate risk profiles." *Id.* at 1167; *see also Boyette v. Montefiore Med. Ctr.*, No. 22-CV-5280 (JGK), 2023 WL 7612391, at *6 (S.D.N.Y. Nov. 13, 2023) (dismissing substantially similar claim). Absent appropriate comparators, Plaintiff fails to plausibly allege a breach of fiduciary duty because "[t]here is no inherent fiduciary duty to offer any particular type of investment vehicle, whether gold bars, hedge funds, collective accounts, or stable value funds," *Moitoso*, 451 F. Supp.3d at 213. Plaintiff's reliance on an alternative investment vehicle

---

[8] The "Total International Stock Index Fund Institutional Plus Shares" product, put forth as a comparator to the "Vanguard Total International Stock Index Fund (SIA-JG5)," does not appear to be a collective investment trust. However, the complaint is devoid of factual support for the allegation it is an appropriate comparator. Additionally, the difference in expense ratios between the two funds is .01%. It would be implausible to infer breach of fiduciary duty from the decision to retain a single fund that is .01% more expensive than the proposed comparator.

to bolster its share class allegations amounts to an allegation the plan should have offered alternate products, which is insufficient to state a claim for imprudence

In a final bid to create a plausible inference of breach, Plaintiff asserts Defendants failed to monitor and control recordkeeping expenses associated with the plan. Plaintiff's complaint is devoid of factual allegations supporting this contention. Instead, she affirmatively alleges Defendants, by subjecting the recordkeeping service to open market bidding, secured a $13 drop in the cost of recordkeeping expenses per plan participant during the relevant time. (Dkt. No. 1, ¶¶ 115-121.) It is implausible to infer breach of fiduciary duty from an alleged $ 13 *decline* in recordkeeping expenses. Moreover, the complaint "fail[s] to allege that the [recordkeeping] fees were excessive relative to the services rendered," *Albert*, 47 F.4th at 580 (quoting *Smith*, 40 F.4th at 449), and fails to "identify similar plans offering the same services for less," *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022). Absent comparators and facts sufficient to ascertain what the recordkeeping services paid for, the court cannot plausibly infer a breach based on excessive recordkeeping. *See, e.g., Smith*, 37 F.4th at 1169 ("As to the recordkeeping fees, Smith fails to give the kind of context that could move this claim from possibility to plausibility."); *Boyette v. Montefiore Med. Ctr.*, No. 22-CV-5280 (JGK), 2023 WL 7612391, 5-6 (S.D.N.Y. Nov. 13, 2023) (dismissing similar claims); *Singh*, 650 F. Supp.3d at 226 (same); *Wilcox v. Georgetown Univ.*, No. CV 18-0422 (ABJ), 2023 WL 2734224, at *14-16 (D.D.C. Mar. 31, 2023) (finding recordkeeping fee claim futile even when comparator plans are pled). Accordingly, Plaintiff fails to allege facts sufficient to plausibly infer breach of fiduciary duty. Consequently, Count I will be dismissed without prejudice.

As to Count IV, alleging failure to monitor other fiduciaries, "[a] claim for failure to monitor is derivative of the underlying breach." *Velazquez v. Massachusetts Fin. Servs. Co.*, 320 F. Supp. 3d 252, 260 (D. Mass. 2018); *see also Kenney v. State St. Corp.*, 694 F. Supp. 2d 67, 79 (D. Mass. 2010) (dismissing derivative failure to monitor claim). Because the court concludes Plaintiff failed to plausibly allege

breach of an underlying fiduciary duty, Plaintiff's derivative failure to monitor claim is also insufficiently pled. Accordingly, Count IV will be dismissed without prejudice.

## V. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss (Dkt. No. 21) is GRANTED without prejudice as to Counts I and IV for conduct arising after December 3, 2020, but with prejudice as to conduct arising before that date. Counts II and III are dismissed with prejudice. Plaintiff's motion to strike (Dkt. No. 42) is DENIED as moot.

It is So Ordered.

    _/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge